UNITED STATES of America

v.

Israel BRAUNSTEIN, Moses Braunstein, Miriam Shmidman, Leon Hellman and Liberty House, Defendants.

Crim. No. 78–111.

United States District Court, D. New Jersey.

Memorandum Order Aug. 24, 1978.

On Waiver of Trial by Jury May 4, 1979.

On Trial Matters May 17, 1979.

Supplemental Memorandum July 3, 1979.

Robert J. Del Tufo, U. S. Atty. by Richard L. Friedman, Asst. U. S. Atty., Newark, N. J., for the United States.

Maurice C. Brigadier by Seymour Margulies, Jersey City, N. J., for defendant Israel Braunstein.

Zazzali, Zazzali & Whipple by George L. Schneider, Newark, N. J., for defendant Moses Braunstein.

Robinson, Wayne & Greenberg by Stephen Greenberg, Newark, N. J., for defendant Miriam Shmidman.

Patrick W. McGinley by Suzanne Antippas, New York City, for defendant Leon Hellman.

Samuel Parnes, Jersey City, N. J., for defendant Liberty House.

## MEMORANDUM ORDER

BIUNNO, District Judge.

*Outline*

The indictment, in 19 counts, charges four individuals and one corporation with various federal offenses. These are summarized as follows:

Count 1: Charges a conspiracy to defraud the United States and the Internal Revenue Service, as to all defendants, 18 U.S.C. § 371;

Count 2: Charges all defendants except Hellman with a violation of 18 U.S.C. § 1001, and aiding and abetting under 18 U.S.C. § 2, in respect to the 1973 report of costs for 1972;

Counts 3 & 4: Make the same charges as Count 2 except that defendant Hellman is included, in respect to the cost reports for 1973 and 1974;

Count 5: Makes the same charges as Counts 2, 3 and 4 in regard to the cost report for 1975, including defendant Hellman but not charging defendant Shmidman;

Counts 6, 7, 8 and 9 charge defendant Israel Braunstein with subscribing, etc., false tax returns for Liberty House for each of the years 1972 through 1975; 26 U.S.C. § 7206(1);

Counts 10 through 13 charge defendant Moses Braunstein with aiding and assisting, etc., in the preparation of false tax returns for Liberty House for the years 1972 through 1975, 26 U.S.C. § 7206(2);

Counts 14 through 16 make the same charges against defendant Shmidman for the years 1972 through 1974, 26 U.S.C. § 7206(2);

Counts 17 through 19 make the same charges against defendant Hellman for the years 1973 through 1975, 26 U.S.C. § 7206(2).

Basically, the charges focus on an alleged practice of charging to and having paid by Liberty House Nursing Home of Jersey City various items of capital or operating expense not properly chargeable to it. The theme is that this practice, charged to have been in execution of the conspiracy, resulted in false cost statements being made in a matter within the jurisdiction of HEW, an agency of the United States, in the administration of the Medicaid program, as well as in false tax returns for the nursing home.

Israel Braunstein is alleged to have been a 25% owner of Liberty House, as well as its President and Administrator.

Moses Braunstein is alleged to have been a 50% owner of Liberty House, as well as its Secretary and Comptroller.

Miriam Shmidman is alleged to have been a 25% owner of Liberty House, as well as its Treasurer and employee.

Leon Hellman is alleged to have been a purchasing agent, from about February, 1973 to about December, 1975, for Liberty House as well as for other nursing homes owned by Moses Braunstein.

All defendants have filed extensive motions on a wide variety of matters. Most of these come within the scope of the standard discovery order entered in this court regu-

larly at arraignment since the taking effect of the Speedy Trial Act, in the Fall of 1975. Others fall outside that order. A special date and time was set, and argument on all the motions was heard July 24, 1978, decision being reserved. This ruling is a disposition on all the motions.

Since one or another defendant joined in motions made by others, the dispositions are on an item-by-item basis without regard to which defendant made the motion, and which ones joined in it.

*Motion to sever the trial of Moses and Israel Braunstein.*

This motion is based on the proposition that if Moses Braunstein exercises his right to take the stand in his own defense, or as a witness for Israel Braunstein, he would be subject to cross-examination which may call on him to testify against Israel Braunstein, contrary to his religious principles and contrary to Israeli law said to embody those principles. In sum, the contention is that a joint trial would confront him with an irreconcilable conflict between his secular legal rights and his religious beliefs.

The only material submitted is a supposed translation of sections 3 and 4 of what is said to be the Israeli Evidence Ordinance (secular), and two pages from what appears to be an unidentified edition, in English, of Talmud (religious).

As is well known, Jewish religious law is founded on Torah, the written law as given by the Lord to Moses and embodied in the first five books of the Old Testament. This written law, which may be likened to a written constitution and statutes, is supplemented by "oral law", or "Torah by Mouth". This oral law consists of both Mishnah, a systematic collection of religious-legal decisions developing the laws of Torah, and Gemara, comprising supplemental material by way of Rabbinical interpretation by various scholars. These three major components, along with Tosephta, Mishradin and Targumin, represent the body of orthodox Rabbinical literature connecting Torah with medieval and modern Judaism.

Talmud itself developed through two streams: one resulted in the Palestinian recension of Mishnah and Gemara; the other resulted in the Babylonian recension.

For an extensive general review of these and other materials, see Encyclopaedia Brittanica, 11th Edition, "Talmud".

In any event, it is of interest to examine the written law, Torah. A brief inspection discloses a number of written laws pertinent to the question presented. Thus, the law is written:

. . . "Ye shall not . . . deal falsely, neither lie one to another," Leviticus, xix., 11.

. . . "Thou shalt not defraud thy neighbor", Leviticus, xix., 13.

. . . "If a soul sin . . . and lie unto his neighbor in that which was delivered to him to keep . . . or hath deceived his neighbor . . . in any of all these that a man doeth, sinning therein:

"Then it shall be, because he hath sinned, and is guilty, that he shall restore . . . the thing which he hath deceitfully gotten . . . [and] he shall even restore it in the principal, and shall add the fifth part more thereto, and give it unto him to whom it appertaineth." Leviticus, vi., 2–4.

. . . "And it shall be when he shall be guilty in one of these things, that he shall confess that he hath sinned in that thing." Leviticus, v., 5.

. . . "Therefore shall ye observe all my statutes, and all my judgments, and do them." Leviticus, xix., 37.

. . . "When a man or woman shall commit any sin that men commit, to do a trespass against the Lord, and that person be guilty, then they shall confess their sin which they have done and he shall recompense his trespass with the principal thereof, and unto it the fifth part thereof, and give it unto him against whom he hath trespassed." Numbers, v., 6–7.

These excerpts from Torah, the written law, are mentioned to illustrate the inconsistency of the motion to sever. If Israel be

not guilty, to the knowledge of Moses, then Moses cannot testify "against" Israel because Torah commands Moses not to lie. If Israel or Moses or both be guilty, then Torah obliges each to confess, in which event neither would be called upon to testify "against" the other; and to the extent that either or both has "deceived his neighbor" (HEW and IRS), they are not only obliged to confess, but also to "restore the thing . . . deceitfully gotten", and 20% in addition. This they must do because they are commanded by the written law to "observe all my statutes . . . and do them."

Thus, one difficulty with the motion is that the claimed dilemma arises only because Moses (for example) wants to rely in one respect on secular law, and in another respect on religious law, selecting from each that which seems most advantageous. This is an artificial, self-inflicted dilemma. If he has any right to choose between secular law and religious law (for the sake of argument), the choice is only between all of one or all of the other, but not a choice between some favorable parts of one and another favorable part of the other; especially where claiming a right under secular law would violate religious law. The reason for this is that to do so establishes that he is not bound, or does not feel himself bound, by the principles of the orthodox religion. Religious belief is the underpinning of the motion, and so a claim of right to adhere to it in one respect but not another indicates that the underpinning itself is a sham and a delusion.

 No doubt the argument would run that what is said in Torah and Talmud by way of duty, of commandment, and the like, has only religious, not secular consequences. But to make that argument is to concede that the question is governed, in a secular court, by secular law and not religious principles. There is no doubt that the written law of Amendment I declares that the Congress shall make no law prohibiting the free exercise of religion, but this does not go so far as to require that the secular law governing the trial of criminal cases must give

way to the religious beliefs of every accused or of every witness. Compliance with secular law in a secular court does not infringe the individual's free exercise of his religion. It does not oblige him to alter his beliefs, even though it may compel him to do an act contrary to those religious beliefs. To the extent it does, the act is not of his own will but is one compelled by law, and he remains free to believe that it is contrary to the principles of his religion.

Beyond that, the point advanced is plainly without substance because it is wholly unrelated to the matter of joint trial or severance. Precisely the same situation would prevail if Moses had not been charged, and were called as a witness by either the United States or by Israel, in the trial of a charge against Israel.

This is further emphasized by an examination of the orthodox religious law particularly relied on to support the motion for severance. The examination begins with the injunction in Torah, that: "The fathers shall not be put to death for the children, neither shall the children be put to death for the fathers: every man shall be put to death for his own sin." Deuteronomy, xxiv, 16. This was interpreted to prohibit the testimony of parents against children and of children against parents. This interpretation served as the source for a disqualification of relatives in general. The Mishnah lists a father, brother, uncle, brother-in-law, stepfather, father-in-law and their sons and sons-in-law as disqualified relatives; and this rule was extended to cover nephews and first cousins.

The important point about these rules is that the disqualified witness could not testify at all, whether for or against the relative. For that reason, the party himself is incompetent to testify for or against himself, because "a man is related to himself." Thus, the party cannot testify at all, and everything he says in court is mere pleading, presumably to be established by competent evidence. See, *Encyclopedia Judaica*, "Witness", p. 588.

This is not unlike the English common law rule under which a party was not com-

petent to testify at all, although many states long ago eliminated that disqualification, e. g., N.J.S.A. 2A:81–1; Fed.Ev.Rule 601.

Accordingly, if Moses is entitled to press his religious beliefs as having constitutional priority over secular law, he will (1) be relying on secular law to support the proposition and (2) under the orthodox religious law he advances, he cannot testify at all, whether there be a joint trial or separate trials.[1]

If the claim had any color of validity, of course, it would be necessary to conduct a preliminary inquiry under Fed.Ev.Rule 104 to ascertain whether Moses does in fact adhere to all the laws, principles and tenets of the orthodox religion he professes, and whether Israel is in fact his son. The court has nothing before it at this time to provide a basis for such a determination, and as the foregoing analysis indicates, such an inquiry would need to explore all the aspects in regard to which the religious law conflicts with secular law, in order to determine the genuineness of the claim of religious adherence.[2]

For the foregoing reasons, the motion to sever the trials of Moses and Israel is DENIED.

*The "deposition" of Moses Braunstein.*

During the investigation stage of this matter, Moses Braunstein was interviewed by a representative of the U.S. Attorney's office and a representative of the State of New Jersey. The interview was conducted at the New York apartment of Moses Braunstein's lawyer, who is said to have been confined at home recovering from hepatitis. The interview was recorded stenographically, and a transcript was prepared. All of the defendants either have a copy of the transcript or access to it.

In the course of the interview, Moses Braunstein made various statements about one or another co-defendant. In at least one instance, the statement included what might be called a disclosure of a statement against interest by a co-defendant to Moses Braunstein.

It appears that the statement was taken and recorded in the fashion it was in order to accommodate Moses Braunstein's attorney, and that there was some understanding in respect to how the transcript was expected to be used. Although three lawyers were present, none took the precaution to state for the record what the terms of the understanding were. In this posture, its accurate reconstruction would doubtless be an exercise in futility.

1. See, also, "The Spirit of Jewish Law", by George Horowitz (Central Book Co., New York), Second Reprint, 1973; especially §§ 361, et seq., dealing with "Proof by Witnesses." Particularly at pages 688–689, Mr. Horowitz observes that while the Geonim listed 80 grounds of incompetence of witnesses based on mere relationship by blood or marriage, "this whole body of law became practically obsolete in the Middle Ages," and were thereafter "applied only to courts whose procedure was in strict accordance with Biblical Law." It therefore appears that as secular courts were established, the restrictions were abolished and the proceedings have since been governed by secular law applicable to the secular courts. This analysis by Horowitz makes clear that a trial in this court is to be governed by federal secular law and that religious law has no application.

2. At the argument of the motions, there was a discussion of this issue at Tr. 7/24/78, pp. 59–74; 82–84, during which it was pointed out that the submission of a translation of two sections from the Israeli Evidence Ordinance, and two pages from Sanhedrin were quite inad-

equate to support the contention. Counsel said an effort would be made to submit more. By letter of August 3, received August 8, counsel reported that no English translation of the Israeli law is available anywhere in the United States, and that it would take from 2 to 4 weeks to get one from Israel.

In view of what was turned up by the court's own research, there is no reason to delay the ruling. In the first place, the point has no bearing on the question of severance, as shown by the analysis. In the second place, the ancient religious disqualification of the witness was abandoned in the Middle Ages. In the third place, evidence of secular Israeli law is irrelevant to the alleged religious dilemma.

Material to support any motion should accompany the motion, and without such material the motion must be denied. If an application for re-argument is to be made, it must be served and filed within 14 days of the order under the General Rules of this court, and of course must be accompanied by everything needed to support it.

In any event, it appears that the attorney for Moses Braunstein made one or more statements, possibly by way of caution to his client, which are said to be biased or prejudiced statements about one or another co-defendant. Also, it appears not in dispute that the U.S. Attorney read parts of this transcript to the Grand Jury in this matter. Presumably, the New Jersey representative made some like use of the transcript before the state Grand Jury.

The representation is that in the federal proceedings, while no witness was present and testifying, a CSR was present but did not make a verbatim record of what was read to the Grand Jury. Instead, the reporter took notes of the page and line of excerpts where portions read to the Grand Jury began, but not where they ended. As a consequence, it is impossible to determine just what parts were read. Evidently, for the purpose of the reading, there was not either a pre-marked copy to indicate what was read, or a list of segments delineated by page and line from start to end of each segment. For the purpose of the motion, the court accordingly has no choice but to assume that the entire transcript was read.

██ On this assumption, the court finds no basis to support any of the motions grounded on this state of facts. Although taken in the form of a deposition, the transcript amounts to nothing more than a statement of Moses Braunstein, as defined by the Jencks Act, 18 U.S.C. § 3500. By paragraph (e) of that Act, a "statement" is defined as including (among other forms):

"(2) a stenographic recording . . . or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement."

Once the United States has such a "statement" in its possession (whether disclosed to a Grand Jury or not), a number of consequences follow. Under F.R.Crim.P. 16(a)(1)(A), if the witness be a defendant, he is entitled to a copy of it. Also, if it contains exculpatory material in respect to another defendant, then under *Brady*, a copy must be furnished to that defendant. Further, if the statement includes material inculpating some other defendant under the *Bruton* rule, then if there is to be a joint trial, that material is to be deleted (i. e., the statement is to be "redacted" or edited for that purpose) and copies furnished. These matters are all governed by the standard discovery order entered at arraignment in every criminal case in this district since the Speedy Trial Act took effect in the fall of 1975.

The final consequence is that should the witness be called to testify by the United States, then at the end of his direct examination the court is required to order the statement produced before cross-examination. 18 U.S.C. § 3500(b). Since Moses Braunstein is a defendant and so cannot be called as a witness by the United States, and since all defendants at least have access to a copy of the statement, this consequence has no significance in this case.

Finally, should Moses Braunstein take the stand to testify, as it is his right to do if he so chooses, the entire statement may be used, and the rule of *Bruton* will not apply since he will be subject to cross-examination by any party who chooses to ask questions.

Also, in this connection, and subject to everything said so far, in the event that Moses Braunstein takes the stand at trial, the statement would not be hearsay under the definition of Fed.Ev.Rule 801(d)(1)(A) or (B).

The objections and motions directed to the use of this statement before the Grand Jury are without merit or substance. The fact that this statement was taken formally, as though on deposition, with an attorney for the United States, for the State of New Jersey and for the witness all present and participating, does not affect or alter its character as a "statement" of Moses Braunstein. It is no different than any other "statement" so defined by the Jencks Act, in whatever form it is obtained and however presented, even if all of it was read, or even if it had been marked as a

Grand Jury exhibit for the jurors to inspect at leisure.

Grand Juries only decide whether criminal charges should be made. Only 16 of the 23 jurors need be present, and only 12 need vote to return an indictment. They do not pass on guilt. Consequently, while the points advanced may call for one or another ruling on the admissibility of evidence at trial, none of them supports any of the motions now made. All motions grounded on this state of facts are accordingly DENIED.

### The coordinated Federal and State investigations and indictments.

A number of motions are grounded on the fact that both federal and state officials conducted investigations in respect to Liberty House, and that separate indictments were returned the same day by a federal and a state Grand Jury. The New Jersey indictment charges violations of state law, namely a statutory conspiracy plus substantive offenses denounced by state Medicaid legislation. The indictment here, as noted at the outset, charges a conspiracy to violate federal law (18 U.S.C. § 371), substantive violations of 18 U.S.C. § 1001, and substantive violations of the income tax law, 26 U.S.C. § 7206. Since Liberty House is a New Jersey corporation, the state could have charged violations of the Business Corporation Tax Law, under which the tax is calculated by two components: net worth and taxable income, but the state evidently chose not to do so.

New Jersey law affords considerably broader discovery in a criminal case than the Congress was willing to allow when it disapproved a number of proposed rules changes in 1975. From the New Jersey discovery, defendants have learned that transcripts of testimony before the federal Grand Jury were presented to the state Grand Jury, and this is relied on for a claim to have discovery of all the federal Grand Jury testimony. The assertion is also made that release of the federal material for state use may have been contrary to the command of secrecy under F.R.Crim.P. 6(e).

Finally, dismissal of the federal indictment is sought on the ground of the *Petite* policy established some years ago by Attorney-General Rogers in respect to federal/state indictments arising out of a particular act or course of conduct.

■ Under our national system of federal and state dual sovereignty, no constitutional or other legal principle bars prosecution by both jurisdictions in these circumstances. The same act or conduct may violate not only a group of laws of the same jurisdiction, but also a group of laws of several jurisdictions. In either case, the "violation" turns upon both a state of facts and a particular law. Any conviction that ensues is not for the state of facts as such, but for the violation of the particular law that is applicable.

No doubt it may be argued that it would be desirable to conduct a single, joint trial when there are charges of violating both state and federal laws. However, no mechanism or authority exists for such a trial. The federal courts are vested with exclusive jurisdiction to try federal offenses, and the state courts have exclusive jurisdiction to try state offenses. The only circumstances under which state criminal charges may be tried in a federal court appear to be those dealt with by 28 U.S.C. §§ 1442, 1442a and 1443, but none of those circumstances are present here.

■ Neither the concept of double jeopardy nor that of collateral estoppel (under *Ashe v. Swenson*) has any application to prosecutions by separate sovereigns. In fact, if these principles or concepts could be applied, they would require defendants to stand trial, in a single trial, on all the charges both federal and state. The facts established at trial may support a conviction of violating one law but not another, and the sovereign is entitled to have the jury consider all the charges in light of all the evidence. This is the most that a defendant could ask for when the charges are made by a single sovereign. The charges having been made by indictment, a defendant has no claim of right to be tried only on

some but not on others. To allow such a claim (absent an agreement to waive claims of double jeopardy and collateral estoppel, if either or both can be waived) would make a mockery of the principles relied on. It would allow a defendant to pick and choose those charges for which he estimates the proof is weakest, and if successful in obtaining a "Not Guilty" verdict on those, then claim to be free of trial on the stronger charges. There is no recognized basis for this sort of gamesmanship.

█ Since the separate indictments are by separate jurisdictions and involve the alleged violation of separate laws of those jurisdictions, there can be no bar of the prosecution of one set in favor of the others. Although constitutional principles as interpreted by the Supreme Court of the United States are paramount law binding on both sets of courts, there are many variations in the laws governing federal and state prosecutions that do not rise to the level of constitutional command. Thus, even the essential elements of a state offense will differ from those of a federal offense in one particular or another, and for that reason alone a conviction or acquittal in one jurisdiction on charges of violating its laws furnishes no legal or constitutional basis for barring prosecution in the other jurisdiction for violation of its separate laws.

The point is sharply marked by the charges for federal income tax violations. No state indictment could advance these charges, and conceivably there can be a conviction on these charges combined with an acquittal on one or more of the other federal charges.

This relationship can come up in other ways. There comes to mind the instance, in an unreported case some 10 or more years ago, in which a corporate employee embezzled substantial funds over a period of years. When discovered, he was told by his employer that he not only had lost his job and was subject to state prosecution for embezzlement, but that he was also facing income tax problems because embezzled funds are taxable income. The employee replied that he had no such problem. He was aware of the income tax rule, and had reported the embezzled funds. Not only that, but he had embezzled the money so he could be a philanthropist beyond his means, and had donated the money to various charities, which entitled him to take deductions to "wash out" the ill-gotten income.

In that peculiar and unusual state of circumstances, since there was no federal law applicable to the embezzlement, he could only be charged with violating state embezzlement laws but not for violating federal tax laws.

█ In this case, the preparation and filing of federal tax returns, as well as the doing of acts reasonably expected to reflect in those returns, are separate and apart from the other charges. If the charges are true (and the court expresses no view), defendants could have filed truthful tax returns (as in the case of the example of the embezzler) and they would have been free of Title 26 charges. The indictment charges that they did not do this, and so they must face a federal trial for federal offenses, and a state trial for state offenses.

█ Insofar as "cooperation" between federal and state authorities are concerned, the fact is that law enforcement officials are expected to cooperate. There is no right to be free of joint investigations. Whoever violates any law should expect to be investigated and charged by the efforts of law enforcement agencies of every jurisdiction having an interest. That is the extent of the risk taken. A driver of a car with expired license plates and controlled dangerous substances should expect to be charged with violating the laws of the state where he is discovered, of the separate state where the vehicle is registered, and if he crosses state lines, with violation of applicable federal laws. It is too bad, as the English judges say, but if the accused did violate a group of laws of different jurisdictions, it is the result of his own acts and conduct, and he can be made to stand trial on all of them.

Insofar as Rule 6(e) is concerned, it is probably the duty of a U.S. Attorney to cooperate with state law enforcement personnel and to exchange information. In this sense, the providing of information adduced before a federal Grand Jury probably does not controvert the rule. In this case it is not necessary to decide the point because an inspection of the sealed records on file with the clerk discloses that there were court orders, on joint application of the U.S. Attorney and the Attorney-General of New Jersey, authorizing Grand Jury materials to be furnished to the state.

Nor can any invidious purpose be inferred from this arrangement. As is well known, federal Grand Juries serve regularly for 18 months, one day each week, with a total of 5 available to adduce testimony in any week. State grand juries serve for a much shorter term of 2 or 3 weeks. In an extended investigation, it is rational to make the initial presentation to federal Grand Juries, and to present what they have learned, at the end, to a state Grand Jury.

For the reasons stated, all motions based on this state of facts are DENIED.

*Motions for stay.*

■ It is argued that the trial here should be stayed to allow the state trial to be conducted first. The federal courts have a Speedy Trial Act; the state courts (to their good fortune) do not. Obviously, both trials cannot proceed at the same time if only because each defendant must be present at the trial, and because counsel of his choice cannot be in two courts at the same time.

In this court, trial will be reached as soon as other cases ahead of this one are disposed of. If, at that time, the state trial has begun, this one will begin at a reasonable point after the state trial has ended. Conversely, if trial here begins first, the state trial will presumably await the completion of this one.

These motions are accordingly DENIED.

*Jurisdictional objections.*

■ Some motions are based on the argument that the Liberty House cost statements were physically submitted to the State of New Jersey, and not to any agency of the United States. These motions are without substance and frivolous. The federal law, 18 U.S.C. § 1001, applies when false statements, etc., are made in a matter within the jurisdiction of any department or agency of the United States. Both HEW and IRS fit this description.

The structure of the federal laws on Medicaid contemplates that the states establish programs, and make payments on the basis of cost studies. The state, in turn, having paid the provider, grounds its claim for reimbursement of the federal share on the cost studies submitted to it.

A clearer case of making false statements, etc., within a federal jurisdiction, can hardly be imagined. The motions grounded on this theory are accordingly DENIED.

*Miscellaneous aspects.*

A number of discovery motions sought access to documents, not in the possession of the United States but in the possession of New Jersey or New York. The United States has agreed to gather these documents and to provide access. As a result, some motions may be withdrawn and others pressed.

Since these items do not fall within Rule 16 or the standard discovery order, the court cannot rule on them at this time, or fix a specific time schedule. Instead, a formula arrangement was established, and it is recorded as follows:

1. On whatever date the United States has gathered all the documents from other sources, it is to prepare a list of them in writing, and serve a copy of that list on all defendants with the original to be filed with the clerk.

2. Within 7 business days after the notice is served, each defendant must serve and file a statement indicating which motions are withdrawn and which are to be pressed, with a copy to the court in chambers.

*Other motions.*

All other motions now pending are DENIED. The appendix to this motion lists their subject matter.

*Trial Date.*

A jury panel will be ordered for October 2, 1978 for the trial of this case. A number of defendants, less than all, stated at the argument of the motion that they would serve and file waivers of their rights under the Speedy Trial Act as a basis for stay of trial here. These offers cannot be considered. The court will not direct that any waivers be made as a condition for a ruling. Waivers, to be effective, must be knowledgeable and voluntary. Any defendant who chooses to do so is free to file a waiver of rights under both the Speedy Trial Act and under the Sixth Amendment. The court has no voice in whether they should do so or not. If any choose to do so, it should be realized that in a case with multiple defendants such waivers are meaningless unless all defendants make identical waivers.

SO ORDERED.

## APPENDIX

1. Motion to dismiss based on claim of discrimination in the selection of the Grand Jury. Under F.R.Crim.P. 6(b)(2), the motion is governed by 28 U.S.C. § 1867(e), while the selection method is established by 28 U.S.C. § 1869. This district has an approved plan under that law, and the records and papers are available for inspection under 28 U.S.C. § 1868. Nothing has been presented to show that the plan does not comply with the statute, or that the plan was not followed.

2. Motion to dismiss because of insufficient statement of facts. The indictment adequately states the elements of each charge to enable a defendant to plead double jeopardy in the event of a future prosecution. *Hamling v. U. S.,* 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).

3. Motion to dismiss on grounds of duplicity and multiplicity. A single conspir-

acy may have more than one objective (in this case, affecting both HEW and IRS). *Frohwerk v. U. S.,* 249 U.S. 204, 39 S.Ct. 249, 63 L.Ed. 561 (1919).

4. Motion to dismiss for alleged misuse of the grand jury process and subpoenas. This appears to be another version of the objection to federal/state cooperation already ruled on. No other facts or law are presented.

5. Motion to dismiss for failure to indict other allegedly known co-conspirators. This falls in the area of prosecutorial discretion, besides which it is hardly uncommon for a co-conspirator to be the source of the information leading to the evidence to be relied on.

6. Claim of lack of federal jurisdiction, presumably based on submission of the cost studies to a state agency as the first step of the administration of the Medicaid program. *U. S. v. Beasley,* 550 F.2d 261 (CA-3, 1977); *U. S. v. Catena,* 500 F.2d 1319 (CA-3, 1974).

7. Claim of double jeopardy. Jeopardy has not attached; also, separate sovereigns are involved, *U. S. v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959).

8. Alleged failure to adhere to the *Petite* policy. This is not a rule of law but a housekeeping policy that does not warrant dismissal, *Fry v. U. S.,* 569 F.2d 303 (CA-5, 1978); *U. S. v. Jones,* 334 F.2d 809 (CA-7, 1964).

9. Pre-indictment delay. There is no claim that the statute of limitations has run, and no showing of actual and substantial prejudice, *U. S. v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *U. S. v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977).

10. Discovery of grand jury testimony beyond that called for by Rule 16, by *Bruton* or by *Brady.* There is no showing of any particularized need, or substantiation of a likelihood of gross or prejudicial irregularity, *U. S. v. Budzanowski,* 462 F.2d 443 (CA-3, 1972).

11. The discovery rules do not extend to lists of witnesses, or all materials tending to support the charges, statements of all persons interviewed, and the like, *U. S. v. Randolph,* 456 F.2d 132 (CA–3, 1972); *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977).

12. Request for bill of particulars. *U. S. v. Addonizio,* 451 F.2d 49, 63 (CA–3, 1971).

13. Charge to grand jury. There is no practice of charging a grand jury for a particular case, nor is any stenographic record made. (Note: Since this indictment, a standard charge is read to grand juries in this district).

14. Request for a copy of the *Petite* policy; this is reproduced in full in *U. S. v. Mechanic,* 454 F.2d 849 (CA–8, 1971).

15. Details of alleged conspiracy. *U. S. v. McCarthy,* 292 F.Supp. 937 (SD–NY, 1965); *U. S. v. Zirpolo,* 288 F.Supp. 993, 1022 (D.N.J., 1968).

16. Hearsay testimony presented to grand jury. *Costello v. U. S.,* 350 U.S. 359 (1956); *U. S. v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); Fed.Ev. Rule 1101(d)(2).

17. Records dealing with any orders to compel a witness to testify under 18 U.S.C. § 6001, et seq. This is premature and no disclosure need be made unless the witness testifies at trial, *U. S. v. Mitchell,* 372 F.Supp. 1239, at 1257 (SD–NY, 1973); *Giglio v. U. S.,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

18. Evidence of overt acts not alleged. *U. S. v. Fioravanti,* 412 F.2d 411 (CA–3, 1967); *U.S. v. Randolph,* 456 F.2d 132 (CA–3, 1972).

19. Claim of multiple conspiracies charged as one. This is a question of fact for the jury under appropriate instructions, *U. S. v. Boyance,* 215 F.Supp. 390 (ED–Pa, 1963), aff'd. 329 F.2d 372 (CA–3, 1964); *U. S. v. Kenny,* 462 F.2d 1205, 1216 (CA–3, 1972); *U. S. v. Boyd,* 595 F.2d 120 (CA–3, 1978).

20. Materials in control of State of New Jersey; the United States has undertaken to obtain and provide them.

## ON WAIVER OF TRIAL BY JURY

This is a case in which the court faces for decision the question, mentioned in *Singer v. U. S.,* 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965), whether under all the circumstances the defendants' reasons for wanting to waive trial by jury and to submit to trial by a judge alone are so compelling that the Government's insistence on trial by jury would result in denial of an impartial trial by jury, 380 U.S. at 37–38, 85 S.Ct. 783.

As framed by the Supreme Court in *Singer,* the question in this case may not be quite that narrow, and may not rise to constitutional levels. If it can be decided short of such levels, of course it should be under well established principles of jurisprudence.

In *Singer* after conviction by a jury, defendant contended that on his waiver of jury trial, and the trial court's willingness to approve the waiver, he had a constitutional right to trial without a jury and, to the extent that Rule 23(a), F.R.Crim.P. required the consent of the government, it was invalid.

Following a scholarly review of the English and American precedents, the court concluded that there is no constitutional right to trial without a jury, and that Rule 23(a) was valid. It left open the question stated above, for some specific case where, under the circumstances, the government's insistence on a jury trial would result in denial of an impartial trial. As reserved, this is a constitutional question.

But the Federal Rules of Criminal Procedure, including Rule 23, were adopted pursuant to legislative authority to promulgate rules of "pleading, practice and procedure", see 18 U.S.C. § 3771. The rule was first adopted in 1944, effective March 1, 1946. It was amended in 1966, effective July 1 of that year, and in 1976, effective October 1, 1977. See Federal Rules of Criminal Procedure, U.S.C.S., and Notes of Advisory Committee on Rules. Thus, the question may be open to consider as a matter of interpreting

and applying a procedural rule, rather than as a constitutional question.

In the procedural sense, all the Federal Rules of Criminal Procedure come under the guidance of Rule 2, which is the pole star, and which directs that the Rules ". . . shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay".

The only reason advanced in *Singer* was that a non-jury trial would save time, and this was felt not to amount to a constitutional claim, of itself, although the court's reservation left it open as one of the circumstances which, taken together, would attain a constitutional magnitude.

The court did not have before it a case in which a non-jury trial had been approved without the consent of the government, and that issue was neither considered nor decided.

Not only that, but the circumstances of 1979 are far different than those of 1964–1965. In today's high cost, inflationary economy, it may well be that a saving of time, if the saving be significant, might rise to constitutional levels of itself. This is a 5-defendant case, with separate attorneys for each, plus another for the government, making six in all. The cost for legal services alone (aside from investigative and other support services) is far higher than 15 years ago. Aside from cost to defendants, the cost to the public is far higher. Each hour between the gathering of the parties and their lawyers to begin drawing a jury, until a verdict is reached, will involve at least 33 man-hours just for those who must be in the courtroom. This may be one thing in a trial of 5 to 10 days, but quite another in one that will likely run 40 trial days or more.

But even if that were an adequate factor, by itself, in this case in 1979, the fact is that it is only one of many circumstances warranting an order that the trial be non-jury, as requested by all defendants and as approved by the court, notwithstanding that the government has withheld its consent.

While there are few cases on the subject, the decision in *U. S. v. Panteleakis,* 422 F.Supp. 247 (D–R.I., 1976) involved circumstances approaching those in this one, and District Judge Pettine, after carefully weighing the totality of the circumstances concluded that the trial should be a non-jury trial despite the lack of the government's consent.

All the circumstances involved in that case are involved here, with additional circumstances here supporting the same result. The main difference there was that the charges involved Medicare fraud, while those here involved Medicaid fraud, plus income tax charges.*

The difference between Medicare and Medicaid means that the trial here will involve State law, as well as federal law, thus adding another layer of complicated and different accounting rules. The income tax counts here will bring in still another layer of complicated and different accounting rules. Some defendants are charged for all years, but others only for some.

At an early stage, the court raised on its own motion the need for independent experts to guide the jury through these thickets. As the court saw it, the context would require one expert for basic bookkeeping and recordkeeping systems, for general accounting principles, and the relation of both to income tax principles. Another would be needed for the different accounting principles called for under State law for a State Medicaid program, and for Federal law for State reimbursement, these being different though related sets of rules.

The matter of instructions on the law for a jury is most troublesome in a case like this. The instructions would no doubt need to embrace the separate State and Federal

---

* It is true, as the United States notes, that this case does contain conspiracy charges, which *Panteleakis* did not, and that Judge Pettine took this into account. But the fact that there are conspiracy charges is no assurance that the jury will so find. If it does not, the problem seen by Judge Pettine will exist here. Also, this case includes income tax charges, which *Panteleakis* did not.

laws on Medicaid programs, as well as the State/Federal contract which would ordinarily be a subject for interpretation by the court alone absent some fact issue about the contract, in which case the instructions would be further complicated.

Rulings on evidence, with five separate defendants, would carry a heavy risk that the jury may hold against one defendant evidence admissible only as to another. Taken in light of all the circumstances, each defendant would be most unlikely to have fair assurance that a jury could consider each charge against that defendant independently of the verdicts in respect to other charges or against other defendants.

The government promises some 40 witnesses, and a large volume of exhibits, a number of which probably will be the annual cost studies submitted to New Jersey as well as the annual federal tax returns. Each item of alleged expenditure said to have been improperly charged will need to be traced through books and records to establish their inclusion in the line items of the cost studies and the tax returns.**

The risk of prejudice to a fair trial is extremely high and compelling. Even with independent experts, which would add to the cost and expense as well as to delay, the court is convinced that a jury of laymen could not be expected to master the intricacies and complications of fact and law sufficiently to provide a fair trial.

There is another factor, that did not exist in 1965 when *Singer* was decided, and which was only a small consideration when *Panteleakis* was decided in 1976, and that is the impact of the Speedy Trial Act, Pub.L. 93–619, 18 U.S.C. § 3161 et seq. This year, the final time limits set by that law take full effect, and dismissal is the consequence of failure to begin trial within the final limits. Thus, a trial that takes longer before a jury than it would without a jury, in a *substantial* sense as is the case here, necessarily affects adversely the rights of other defendants and of the public, to have other cases tried within the limits set by the Act.

Each judge can only conduct one trial at a time, and the Speedy Trial Act expressly forbids the exclusion of time due to the fact that the court is trying another case, 18 U.S.C § 3161(h)(8)(C). Thus, a new factor has been added, in that the court, and the judicial system as a whole, simply must conduct each trial as efficiently and expeditiously as possible, consistent with the protection of all constitutional rights, so as not to degrade the equal rights of other defendants and of the public in other cases awaiting trial.

Consequently, taken all in all, the court sees no rational alternative except to order that the trial proceed without a jury, as requested by all defendants and as approved by the court, notwithstanding that the government does not consent.

The government has advanced no reason other than that it is "policy" not to consent. It is the government's right, as recognized in *Singer,* 380 U.S. at 37–38, 85 S.Ct. 783, to withhold consent without explanation. However, when the nature of the policy, and the norms, standards or guidelines of the policy by which consent is given or withheld are shrouded in mystery, the government puts nothing in the balance other than good reputation and motive to weigh against the overwhelming showing of sound reasons presented by defendants.

This ruling is not based on constitutional grounds, but on a reading of Rule 23(a) together with Rule 2. That this is so does not preclude a determination, should it ever be necessary (and which the court cannot foresee) that the totality of the circumstances are of constitutional magnitude. That question is reserved.

At the final presentation on these factors on May 2, 1979, the United States called the court's attention to a number of cases dealing with *Singer* and with Rule 23. The court has examined these, as well as others located by independent research. These are reviewed below in chronological order.

---

** The government has premarked 465 exhibits. Defendants may wish to offer others from the much larger quantity made available on discovery.

*U. S. v. Kramer,* 355 F.2d 891 (CA–7, 1966) was a 2-defendant case under the Hobbs Act. The only ground advanced was that a jury would be "inflamed" by disclosure of an earlier murder conviction of one defendant. The other defendant did not make a request and a motion for severance (on other grounds) had been denied. The court saw no unusual difficulties or complexities.

*U. S. v. Jackson,* 262 F.Supp. 716 (D–Conn., 1967) was a three defendant case under the Federal Kidnapping Act, and carried a risk of the death penalty if the jury so recommended. There was no motion for non-jury trial, and the subject is mentioned only in passing.

*May v. Peyton,* 268 F.Supp. 928 (D–Va., 1967) was a petition under 28 U.S.C. § 2254 in which one claim made was that the Virginia prosecutor refused to let defendant waive a jury trial. No grounds for the waiver were specified, and of course *Singer* was controlling.

*U. S. v. Daniels,* 282 F.Supp. 360 (D–Ill., 1968) was a three defendant case involving some unidentified crime of violence. The motion for non-jury trial without government consent was grounded on a claim of extensive publicity. The court found there had been such publicity, that it had diminished, and ordered a continuance to reduce its potentially prejudicial effect.

*U. S. v. Clausell,* 389 F.2d 34 (CA–2, 1968) was a one defendant case charged with the sale of heroin. The jury waiver issue arose only peripherally: Clausell evidently tried to stall the trial by claiming he wanted new counsel. The court denied that request and his lawyer told the court his client didn't want a jury trial. The court asked Clausell whether or not he wanted a jury trial, and he refused to answer.

*U. S. v. Barber,* 297 F.Supp. 917 (D–Del., 1969) was a ruling denying waiver to which the government had not consented. Evidently, no grounds at all were advanced beyond the proffer of a waiver, and none are discussed.

*U. S. v. Harris,* 314 F.Supp. 437 (D–Minn., 1970) was a bank robbery case. The single defendant sought a non-jury trial because of concern that evidence of his past criminal record, which could be elicited if he took the stand, or to challenge a potential insanity defense even if he chose not to testify, would make an impartial and fair trial impossible. The government did not consent and the application was denied. Nothing approaching the concept of the question reserved by *Singer* was presented.

*U. S. v. Tyler,* 332 F.Supp. 856 (D–Wisc., 1971) was a two defendant firearms case. Tyler moved for severance on a number of grounds, one of which was that "he may decide to waive a jury trial", and speculated that his co-defendant would not. The severance motion was denied.

*U. S. v. Farries,* 328 F.Supp. 1034 (D–Pa., 1971) was a multi-defendant case on charges arising out of a riot at a federal penitentiary. The opinion is on a motion for new trial after a jury verdict of guilty. One defendant, Swanson, had moved for a non-jury trial without consent of the government. His grounds were that the jury would be prejudiced at the outset by knowledge that he was in prison at the time of the alleged offense. The opinion notes that the Court went to great lengths to assure the impanelling of a fair and impartial jury, and careful instructions given.

*U. S. v. Caldarazzo,* 444 F.2d 1046 (CA–7, 1971) was a multi-defendant case on charges of conspiracy to obstruct commerce. One defendant had moved for a non-jury trial without consent of the government. His only ground was the claim of "possible factual complexities" in a conspiracy charge.

*U. S. v. Ceja,* 451 F.2d 399 (CA–1, 1971), was a one defendant case, on narcotics charges, tried in Puerto Rico. Not until after the jury was selected did Ceja move for a non-jury trial, to which the government did not consent. His ground was that he was Cuban, and that Puerto Ricans were prejudiced against Cubans. An evidentiary hearing was held, and the trial judge found Ceja had failed to establish that an impar-

tial jury could not be obtained. The Court of Appeals noted that the situation was unique in that the jury had been selected before the motion was made, and so reviewed the voir dire of the jury selection process. It also noted that before resuming, the trial judge impressed on the jury the importance of disclosing any prejudice against Cubans, and no juror reported any.

*U. S. v. Mayr*, 350 F.Supp. 1291 (D–Fla., 1972) was a two-defendant case on charges of misapplication of bank funds and false entries. Only one defendant, Mayr, sought a non-jury trial without the government's consent. There was a mere allegation of complexity, without more, and the court found that the only difficult jury question was that of the requisite criminal intent.

*McClung v. Weatherholz*, 351 F.Supp. 5 (D–Va., 1972) was a petition under 28 U.S.C. § 2254. The three petitioners were college students convicted of criminal trespass arising out of a demonstration on the campus. Under Virginia's two-tier system, they were first tried in an inferior court without a jury, convicted, and fined $100. each. They then appealed to the circuit, which under Virginia law conducts a trial by jury entirely de novo and with any reference to the first trial strictly forbidden. The jury passes on guilt and also fixes the sentence. The circuit judge declined to approve a waiver of jury trial, and there is no mention of consent by the prosecutor. The jury convicted and imposed more severe sentences. The only claim was that the circuit judge's refusal to approve a waiver was an indication of judicial vindictiveness, on the theory that a rural jury would be hostile to demonstrating students.

*U. S. v. Hill*, 473 F.2d 759 (CA–9, 1973) is a mandamus case turning on the issue of double jeopardy. The jury waiver point is mentioned only in the dissent of Judge Kilkenny in connection with whether a writ should issue. There was no motion for a non-jury trial involved.

*U. S. v. Wright*, 491 F.2d 942 (CA–6, 1974) was a drug case in which a motion for a non-jury trial was denied by refusal to approve the waiver. Non-consent of the government seems not to have been reached by the trial judge. The only ground advanced was that there had been news articles on the general subject of drug abuse, and that the defense of entrapment was too technical for a jury.

*U. S. v. Johnson*, 496 F.2d 1131 (CA–5, 1974) was a case in which the trial court did grant a motion for non-jury trial, but conditioned it on waiver of special findings of fact. This was before the 1977 amendment to Rule 23(c).

*U. S. v. Morlang*, 531 F.2d 183 (CA–4, 1975) was a bribery case in which there had been extensive publicity including the risk of prejudice arising from the alleged involvement of a former governor of West Virginia. This was the only ground. The trial court declined the motion without consent of the government, and the question was tested in the same way all claims of juror prejudice are.

*U. S. v. Wise*, 550 F.2d 1180 (CA–9, 1977) was a case on criminal copyright charges which was in fact tried without a jury. Whether there was consent or not does not appear, nor was the conviction challenged on any ground involving the question. The only mention of waiver is in footnote 25 on p. 1194, where reference is made to the trial judge's requirement that defendant waive special findings under Rule 23(c).

*Vines v. Muncy*, 553 F.2d 342 (CA–4, 1977) is a case on petition under 28 U.S.C. § 2254, Virginia's rule on waiver being like that of Rule 23(a). The main issues concerned Virginia's system under which the jury passes on guilt and also sets the sentence, subject to suspension of execution, imposition and probation without mandate for a presentence report. But if trial be without a jury, a presentence report is mandated. There seems not to have been a request for a non-jury trial in the Virginia court. Rather, the issue was raised as a challenge to the Virginia system, by claiming a right to be tried non-jury on that account. The question of totality of circumstances, reserved in *Singer* was not actually presented.

*U. S. v. Houghton*, 554 F.2d 1219 (CA–1, 1977) was a two-defendant case on cocaine distribution. The denial of a non-jury trial without consent of the government was one of many points raised on appeal. The only grounds claimed were that a jury would not understand a collateral matter involving efforts to locate a government informant and make him available to the defense, and the appointment of defense counsel to prosecute a contempt charge against government agents who allegedly violated an order to locate the informant.

*U. S. v. Alpern*, 564 F.2d 755 (CA–7, 1977) was a four-defendant trial on charges of conspiracy to bomb a tavern and related substantive offenses. The only ground advanced for a non-jury trial without jury consent was the claim that the one defendant who so moved would be prejudiced by the prior records of his co-defendants and the evidence against them at trial. The ground seems to be one more properly addressed to the matter of severance, which was sought and denied.

*U. S. v. Stone*, 444 F.Supp. 1254 (D–Wis., 1978). The moving defendant, Stone, moved before trial that it be without a jury, and the government did not consent. His grounds were (1) the 32 count indictment was complex, charging mainly overt acts and substantive offenses directed at co-defendants, with Stone only named in two counts, and a claim of ensuing prejudice; (2) the investigative file records acts of mail fraud on dates after a date critical to his defense, and evidence of them may be offered to support the conspiracy charge.

The trial judge ruled that these grounds did not amount to the "exceptional circumstances" mentioned in *Singer*.

*U. S. v. Conforte*, 457 F.Supp. 641 (D–Nev., 1978) was a case in which trial was non-jury and with government consent. An appeal was taken on a claim of bias and prejudice of the trial judge, and there was a remand for an evidentiary hearing on the claim, which was found to lack substance.

Unlike *Panteleakis*, and unlike this case, none of this group of cases presented a set of circumstances which, taken together, so

much as approached the boundaries of the area reserved in *Singer*. Even in those cases where some colorable ground was advanced, the ground was one for which one or another well-established method was available to reduce or eliminate the risk. Careful voir dire examination of potential jurors, careful instructions, continuance of trial to reduce the effect of earlier publicity, and the like, are exemplified by *Daniels, Farries, Ceja, Morlang* and *Stone*. Others involve situations where the attempt to waive jury trial was coupled with a motion for severance, no doubt in an effort to bolster the latter motion, such as *Kramer, Tyler, Farries, Calderazzo, Mayr, Alpern* and *Stone*. In several cases, the motion for waiver of jury was granted, but the opinions do not disclose whether it was without consent of the government, such as *Johnson, Wise* and *Conforte*.

All in all, this string of reported opinions do not militate against the conclusion reached here, and none discusses the question as one involving a reading together of Rules 2 and 23 as a matter of procedure rather than as a constitutional issue, in light of the totality of the circumstances in the particular case.

Of course, the case in which grant of the motion is warranted without the consent of the government will necessarily be the rare and exceptional case. Trial by jury should be the primary mode, and grant of such a motion, even where there is consent, should not be *pro forma* or casual. The court has an independent obligation to consider all pertinent aspects before exercising its informed discretion. Of course, in the routine and unexceptional case, the withholding of consent by the government would of itself make it unnecessary for the court to exercise its discretion at all; and where in its sound discretion the court decides not to approve the request, the matter of consent need not be reached at all.

 The court has made a detailed analysis of the indictment, of the federal and state medicaid laws, of the applicable provisions of the Internal Revenue Code and

regulations, in the light of its general knowledge of bookkeeping, accounting, state budget and federal reimbursement mechanisms, and general articles on the economic and financial workings of the Medicaid program. It has also examined carefully the list identifying the 465 proposed government exhibits. It is convinced that in all the circumstances of this case, the motions of all defendants should be granted despite the lack of consent of the government.

Having decided that the motions of all defendants should be granted, the court further rules on its own motion to appoint independent experts. In a non-jury case of this kind, it is highly likely that the court will not need the aid of such witnesses. It regularly masters the intricacies of complex statutes, regulations and contracts whose only resemblance to the national language is that the words are English words. It is fully able, as a law giver and a fact finder, to perform the process of applying specific rules of accounting to specific records. Consequently, the motion to appoint independent experts will be denied, but without prejudice to renewal when the trial record is otherwise complete; should the need then appear for some limited purpose.

A suitable order reflecting the rulings here made will be prepared and entered by the court in advance of trial.

## ON TRIAL MATTERS

The court has deliberated on the matters discussed at the hearing of May 16, 1978, which was treated as a continued Rule 17.1 hearing, and sets out here its dispositions thereon.

1. *Leading questions on direct examination of government witnesses.*

Since the court has only the government's brief on this subject, the evaluation is necessarily provisional and subject to what may be presented by defendants.

No blanket ruling can be made on the subject in advance and in the abstract. The articulation of Rule 611, Fed.Ev.R. is consistent with well-recognized principles of evidence law. Not to be overlooked is the importance of Rule 611(a), which places in the court's hands the control of order and mode of proof, this control to be exercised so as to best achieve the three objectives there stated. The rules dealing with direct and cross-examination, in Rule 611(a) and (b) are necessarily to be read in light of the first paragraph.

In the case of government witnesses who are hostile to it, or identified with an adverse party, special problems arise which experience teaches must be dealt with witness by witness. In a non-jury trial, the goals of Rule 611(a) are best achieved by conducting direct examination in the usual way to begin with. Several outcomes are possible. One is that the witness may decline to answer. If so, the procedures applicable to claims of privilege and recalcitrant witnesses, 28 U.S.C. § 1826, will be generated.

Another is that the witness may answer that he does not remember. In that case the course most likely to achieve the objects of Rule 611(a) is to present the witness with materials that may refresh his recollection. The ensuing responses are of great aid to the court in deciding whether the lack of memory is genuine or feigned. In non-jury cases, where the court feels freer to ask questions of its own, such questioning is an even better test.

Finally, a witness may give an unexpected answer. Here a number of possibilities arise. There may be prior inconsistent statements. It may be that such prior statements were given under oath as Grand Jury testimony. In that instance, the Grand Jury testimony may be evidential of itself, since Congress has declared that in those circumstances it is not hearsay and so may be offered as evidence in chief. See Fed.Ev.Rule 801(d)(1)(A).

Turning to the jury trial, the same problems may arise, but the crucial need to avoid trial error commands that they be dealt with differently. For any witness who the United States has reason to believe will decline to answer (whether justified or

not) or "doesn't remember", or will change his testimony, it should disclose this to the court and its adversaries out of the presence of the jury and before calling the witness to the stand. A preliminary voir dire examination must then be conducted. It may be that when actually sworn and under oath, the witness will answer, will remember, and will not switch his account. This subject has been intensely studied by the scholars, by trial judges and by appellate courts. A useful review is found in this court's unpublished opinion in *U. S. ex rel King v. Hilton*, Civ. 77–1126 (§ 2254), a copy of the pertinent segment of which is forwarded to the parties.

Naturally, such additional mini-trials of preliminary issues will inevitably fragment the presentation of evidence to a jury and, independently of the high cost of the additional time consumed, will adversely affect the opportunity of a jury to pay close attention, to remember, and to perform the many indefinable functions a jury is called upon to perform if a defendant is to have a reasonable opportunity for a fair trial. This is particularly true in a case like this one, which will be both complex and much more protracted if tried to a jury. This aspect has special meaning where it arises on the government's case, for while it is true that the government must take what witnesses it can find, the government's difficulties cannot be laid at the door of the defendants.

Whichever way the case is tried, what has been said outlines the directions the court foresees on this point. Nor must it be overlooked that from the standpoint of effectively achieving a search for truth, the leading question (even when allowable) carries far less weight than the non-leading question. The best cross-examination has always been accomplished by the non-leading question, even though leading questions are allowed.

2. *Stay pending petition for writ of mandamus.*

 The United States has already filed a petition with the Court of Appeals for a writ of mandamus, an indirect form of appeal from the judicial ruling that this case be tried without a jury, on the application of all defendants, and despite the absence of consent by the United States, F.R. Crim.P. 23(a). The petition was filed without the entry of any order for non-jury trial. Under a number of rulings of the Court of Appeals which need not be cited, this procedural defect can be cured at the discretion of that Court if an order is in fact signed and entered before the petition is processed.

After issuing its memorandum on the point, the court prepared and mailed on May 11, 1979, a proposed draft of order dealing not only with that aspect but with procedural matters unique to non-jury trials, in order to achieve the highest possible efficiency in preparation and trial. At the Rule 17.1 conference of May 16, 1979, the court received the benefit of the views of counsel on that order, which has been redrafted for entry.

At that hearing, the United States orally requested a stay of the order until the Court of Appeals could act on the petition. This application must be denied after considering all the factors.

The trial date of May 21, 1979 was set at the request of the United States more than a month before, to provide it with time to gather its documents and arrange for some 40 to 45 witnesses. Defense lawyers, 5 in all, were commanded at the same time to be prepared to proceed with trial on May 21, 1979. They have cleared their calendars for that purpose.

As this court has made clear, any ruling that this case be tried before a jury will put it at the bottom of the criminal jury list, with the earliest possible trial date of January 15, 1980. No delay of any kind can avoid that consequence. The reasons are fully articulated in the memorandum of May 16, 1979 and the transcript of the conference of that day. As finally worked out, the court will set Friday, May 18, 1979 for a nearly full day conference under Rule 17.1 to attending to the pretrial marking of exhibits in respect to which there is no issue

of authenticity and other pretrial items designed to eliminate the need for formal proof if the case is tried without a jury. Since no court can order any party to make agreements, defendants are free to tender lists of facts not in dispute and of exhibits whose authenticity is not challenged on condition that the trial be non-jury. Should that condition not be met, every fact and the authenticity of every document may become the subject of formal proof in the discharge of the government's burden of proof, a heavy one in every case.

A great deal can be achieved by denying a stay, and much more will certainly be lost by granting it. For this reason, the request for stay will be denied.

### 3. Procedural aspects of the order.

The United States objects to paragraph 3 of the draft order to the extent that it calls for written statements of points and precedents without argument, and the defendants ask that the deadline be May 25 rather than May 21, 1979.

The "without argument" aspect is built on the English practice and was intended to eliminate written, but not oral, argument. Argument as such is always allowed. What is intended is that the written submissions be free of argument, most of which is obvious from the statement of points and precedents, but without barring argument to the court on any of the points that may arise during trial. The phrasing will be changed to read: "without written argument."

To accommodate defendants and the needs of the court to process the trial, the filing time will be specified as "at least as early as May 21, 1979 and in any event no later than May 25, 1979," with the encouragement to file at the earliest feasible date.

Defendants also ask that the scope of par. 4 be enlarged to add provision for submission of points and precedents dealing with evidential aspects of documentary evidence. While this is probably redundant, it will be made explicit.

The court also raised the question whether any defendant is willing to waive the right to be present at any time during trial when, for any reason, personal or otherwise, the trial might otherwise be delayed on that account. Counsel are to be prepared on this point on Friday, May 18, 1979, which will also be set as the final stage of the Rule 17.1 hearings, with all individual defendants present so that they may sign whatever writings called for by that rule have been developed during the day.

Another aspect, not explicitly discussed on May 16, 1979 involves ascertainment, unequivocally of the point at which the "trial" will begin in the Double Jeopardy sense. If the trial were with a jury, recent case law makes it clear that the crucial point is when the jury is sworn. If the trial is non-jury, the parties are put on notice that "trial" will begin in the Double Jeopardy sense at the point when the attorney for the United States speaks the first word by way of "opening statement" after being explicitly allowed to do so by the court on request. If there be no such "opening statement", then the "trial" will begin at that point when the United States calls its first witness to the stand, or offers in evidence its first item of documentary proof, whichever first occurs.

### 4. The judicial appointment of Mr. McGinley.

Mr. McGinley, attorney for defendant Hellman, has been very recently nominated by Mayor Koch of New York for appointment to the Criminal Court of the City of New York. Mayor Koch has calendared a public hearing for May 21, 1979 at 1:30 P.M. Whatever appointment may be made will occur after that hearing.

Mr. McGinley has made no application to be relieved in this case, and does not intend to do so at this time. He represents that he has informed Mayor Koch of his commitment to his client and the court in this case, and has asked that he not be expected to take office until June 6, 1979. Once he takes office, he will be forbidden to practice law. No one can compel him to raise his hand and take the oath of office; he can only do so voluntarily. The law is a jealous

mistress, and everyone can freely refrain from saying "I do" at the wedding.

In view of the weighty consequences of any delay in the start of trial on May 21, the court has no choice but to say that it sees no basis on which it can grant leave for withdrawal and substitution to Mr. McGinley because of his impending appointment to the bench. His assumption of the duties of that office will simply need to await the completion of this trial so that his professional responsibility to his client and his duty as an officer of the court in this case can be discharged and completed before he assumes new ones. No withdrawal or substitution can be expected to be allowed unless his client is prepared, knowingly, intelligently and voluntarily, to satisfy the court that he will accept a substitution of a new attorney who can proceed to trial without delay and without interruption.

5. *Length of trial.*

One of the considerations advanced at the hearing of May 16, 1979 was that the United States expects to need some three weeks to adduce its evidence, and that even with a non-jury trial beginning May 21, 1979 this could not be completed before June 6, when Mr. McGinley is tentatively scheduled to be sworn as a judge of the Criminal Court of New York City.

This estimate overlooks the advantages of a non-jury trial. The substantive counts of false statement (Medicaid fraud) and of false tax returns, are concerned with 4 calendar or taxable years. For each such year, there may be some number of items or transactions on which the common claim of falsity is grounded. If the United States has evidence to prove the charge for any year, it is hardly necessary to offer evidence in respect to every questioned item or transaction. The charges do not depend on specific amounts. They depend on falsity. As with any collection of questioned items or transactions, it is inevitable that the available evidence will be stronger for some than for others.

As an exercise of its control over the order of proof, the court will expect the United States to offer its strongest evidence for each year first, so that at some point, to be evaluated during trial, less persuasive proof for other items will tend to be cumulative rather than corroborative, and hence not worth offering. The court will expect this order of proof to be followed, and if followed so that weaker cumulative evidence is eliminated, this case can easily be completed before June 6. The court is ready to sit for extended hours and extra days, including the afternoon of the motion day, May 29th, and Saturday or Sunday. All that is needed is for the lawyers, as officers of the court, to bend their efforts to the same goal instead of resisting it. Should the case not be completed before June 6, Mr. McGinley and his client should expect that leave for withdrawal and substitution will be denied. A few days will not make that much difference, and the Court stands ready and available to inform Mayor Koch of the importance of a brief postponement should that be needed.

6. *Final form of order.*

A final form of order has been prepared and is signed simultaneously herewith for entry.

SUPPLEMENTAL MEMORANDUM

For the completeness of the published materials in this case, the following events should be noted.

On May 21, 1979, the case was called for trial without a jury, all parties and attorneys being present. The United States reported that a motion panel of the Court of Appeals had entered a stay of the bench trial for which formal order had been entered May 17, 1979. In these circumstances, the court entered an order that day continuing the trial to January 15, 1980. A copy of that order follows this memorandum. All parties agreed on the record that no trial had begun, as defined in the May 17 order.

Thereafter, the case was assigned to another judge who had a "calendar break" at the time, and he set the case for trial, with

a jury, for a short date. Before any trial began, all defendants entered guilty pleas pursuant to Rule 11, F.R.Crim.P. This event mooted out the petition for mandamus or prohibition which was then pending, unheard and undecided, in the Court of Appeals.

The various rulings and pertinent orders have been approved for publication to preserve the materials for another day.