**UNITED STATES of America**

v.

**Anthony DiPASQUALE, et al.**

Crim. No. 81–00361–1–8.

United States District Court,
E.D. Pennsylvania.

April 8, 1983.

As Amended May 4, 1983.

Ronald G. Cole, Molly H. Colburn, Asst. U.S. Attys., Dept. of Justice, Philadelphia Strike Force, Philadelphia, Pa., for plaintiff.

Robert Scandone, Philadelphia, Pa., for Anthony DiPasquale.

Edward Reif, Philadelphia, Pa., for James DiPasquale.

F. Emmet Fitzpatrick, Philadelphia, Pa., for Peter Serubo.

Ronald Ervais, Philadelphia, Pa., for Victor Szwanki.

Robert A. McAteer, Philadelphia, Pa., for Peter Serubo.

Joseph M. Miller, Federal Defender Ass'n, Philadelphia, Pa., for August Redding.

Timothy J. Savage, Philadelphia, Pa., for Joseph West.

Richard R. Galli, Philadelphia, Pa., for Nicholas Fidelibus.

Edward A. Rudley, Philadelphia, Pa., for Neil Ferber.

## OPINION

DITTER, District Judge.

In this case, seven of nine defendants [1] were convicted of various counts of collecting claimed extensions of credit by extortionate means,[2] and six of those seven were

---

1. Neil Ferber was acquitted on all counts with which he was charged and Joseph West entered a plea of guilty on count 2.

2. Title 18, United States Code, section 894(a) states in its entirety:

§ 894. Collection of extensions of credit by extortionate means

(a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means

(1) to collect or attempt to collect any extension of credit, or

(2) to punish any person for the nonpayment thereof,

shall be fined not more than $10,000 or imprisoned not more than 20 years, or both. 18 U.S.C. § 894(a) (1976).

convicted of conspiracy to do so.[3] Defendants raise a myriad of post-trial issues ranging from legal and factual insufficiencies in the evidence to errors in pre-trial and trial rulings. For the reasons which follow, all motions must be denied.

Because the Government charged certain defendants with three substantive violations occurring on different dates, in addition to the conspiracy count in which all defendants were charged, I must specify which defendants were charged in each count of the indictment.[4] Count I charged Anthony DiPasquale, August Redding, and Victor Szwanki with beating and threatening Michael Cosmo on December 13, 1979, to collect a claimed debt of $5000.00. Count II charged Anthony DiPasquale and Victor Szwanki with beating and threatening James Kolzer from March 25, 1981, to March 26, 1981, to collect a claimed debt of $16,000.00. Count III charged Anthony DiPasquale, Nicholas Fidelibus, John Serubo, and Peter Serubo with beating and threatening Swain Crawford on May 9, 1981, to collect a claimed debt of $1800.00. Count IV charged each of these defendants and James DiPasquale with having been members of a conspiracy to collect claimed debts by extortionate means. The conspiracy was alleged to have spanned approximately two years from September, 1979, to November, 1981. Additionally, each of the substantive violations, *inter alia,* were named as overt acts alleged to have been committed in furtherance of the conspiracy. In short, not all members of the conspiracy allegedly participated in each substantive violation, the time between the first and second substantive violations was approximately fifteen months, and some of the defendants charged in the substantive violation of May 9, 1981, (Count III) had no other apparent connection with the conspiracy.

In view of the fact that many of the defendants' assertions of error revolve around whether the Government proved multiple conspiracies rather than a single conspiracy as charged, I must discuss the facts in detail. Viewed in a light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence revealed that the defendants conspired to collect claimed debts by beating, threatening with violence, or both, at least five individuals who each had business relationships, whether legal or illegal, with some of the defendants. Each victim was lured to a convenient location for the beating or extortion by one or more of the defendants whom he knew, outnumbered by his assailants, and beaten or threatened with violence for nonpayment of a non-existent debt. Each victim was beaten or threatened with violence until he agreed to repay the "debt", and then directed to arrange by telephone or otherwise to obtain cash from friends, relatives, or other sources, in some instances, while still in the custody and control of the defendants. Additionally, each victim was threatened with more violence if he reported his ordeal to anyone, especially law enforcement authorities.

The first victim, Michael Cosmo, was involved in distributing methamphetamine with Anthony and James DiPasquale during 1978 and 1979. In addition to selling drugs, Cosmo was Anthony DiPasquale's "runner". Cosmo was beaten on three occasions and the victim of extortion on four. The first incident took place in September, 1979, when Anthony DiPasquale telephoned Cosmo and directed him to go to DiPasquale's farm in Cardiff, New Jersey, "Resorts Concrete," a place to which Cosmo had travelled on several occasions to deliver money, pick up drugs, and care for a horse he owned jointly with Anthony. Because upon his arrival at the farm only August Redding was present, Cosmo went to care for the horse and wait for Anthony. After approximately one to two hours, Redding appeared outside the house, pointed a shot-

---

**3.** Nicholas Fidelibus was acquitted on the conspiracy count.

**4.** Because both Ferber and West are not involved in the post-trial proceedings, I have eliminated all reference to them in this opinion as defendants. I will, however, mention West again because he testified at trial.

gun at Cosmo, informed him that Anthony had telephoned, and ordered him into the house. Redding also asked Cosmo if he had the $5,000 he owed to Anthony. When Cosmo asked Redding what he was talking about, Redding warned Cosmo that "he better come up with the money or he knew what would happen". Redding then beat Cosmo with the rifle butt rendering him unconscious. Upon awakening the next day, Cosmo was taken by a partner of Anthony's, Alfredo, to a house located in Longport, New Jersey, owned by the parents of Anthony's girlfriend. As Cosmo entered the house, he heard Anthony DiPasquale from a floor above shouting that he was going to make an example of Cosmo, and that "he's [Cosmo] got to go". Anthony then cocked his gun and started down the steps to where Cosmo was being held. At this point, Cosmo thought that he was going to be killed. Holding the gun to Cosmo, Anthony demanded money, and Cosmo not denying the debt, said he would borrow it as soon as possible. When Anthony warned that Cosmo's family would be in danger if he did not pay Anthony $5,000, Cosmo telephoned several people attempting to raise money. Apparently satisfied with Cosmo's promise to pay, Anthony directed that Cosmo be taken back to the farm and released. Two days later, when Cosmo had collected the $5,000, Anthony was notified and within fifteen minutes, arrived at Cosmo's house to pick up the cash.

The second incident occurred in November, 1979, when Cosmo received a telephone call from Anthony inquiring whether Cosmo had the $2,500 he owed to Anthony. Consistent with the September extortion, Anthony warned Cosmo to "get the money or else". Despite the fact that he did not owe any money to Anthony, Cosmo told him he would get it in a few days. Again Cosmo borrowed the money, and upon notification by telephone of this fact, Anthony again came to Cosmo's house to pick it up.

The third incident, the one described in count I of the indictment, occurred a few weeks later, in mid-December, 1979. Cosmo received a telephone call from Anthony inquiring whether Jimmy Minnick still installed carpet for his livelihood and whether Cosmo still worked for him. When Cosmo responded in the affirmative, Anthony said he needed carpet for his basement and asked Cosmo to make the necessary arrangements for its installation. Cosmo said he and Minnick would stop by to measure the area, discuss the type of carpet to be installed, and quote a price for the job. This Cosmo did without incident. The next morning when Cosmo and his employer arrived at Anthony's house to install the carpet, a group of men including defendants Anthony DiPasquale and August Redding, were playing cards. Later in the morning when Cosmo went to leave to take his car to his wife, he was stopped at the door by Redding who hit him, knocking him to the floor. As Cosmo lay there, he was kicked and punched by Redding, and then hit by Anthony in the side of the head with a fireplace poker. Anthony continued to beat Cosmo with the poker finally rendering him unconscious. When Cosmo awoke in the basement of the house, he was handcuffed to a pinball machine. Anthony was at the top of the stairs shouting that if Cosmo did not have "the money" he would die. Cosmo then agreed to borrow money to pay Anthony. Beaten and bloodied, Cosmo went to leave the house only to be stopped by Victor Szwanki who beat him again.[5] Soon thereafter, Cosmo was released eight blocks from his house with a towel over his head. As a result of this beating, Cosmo was hospitalized for three or four days. Upon his release from the hospital, however, Cosmo again borrowed the money from a family member and paid Anthony.

The final beating occurred in January, 1980, when Cosmo was installing a ceiling with relatives in his home. Visited there by James DiPasquale, Victor Szwanki, and two

5. There was testimony that several people at Anthony's house voiced concern over what Cosmo's relatives might think upon viewing Cosmo in his beaten condition. Throwing a glass of whiskey in Cosmo's face, Anthony responded that they would think Cosmo was in a barroom brawl.

others, Cosmo was taken to a back room and blamed by James DiPasquale for causing his brother to "go away". James DiPasquale then demanded $25,000 from Cosmo saying he owed it to Anthony. When Cosmo told them he did not owe any money to Anthony, James DiPasquale and Victor Szwanki beat and choked him giving as an excuse that because of him Anthony was in jail.[6] Despite warnings from his assailants not to go to law enforcement authorities, Cosmo reported the incident to police after being pressured to do so by his family. Shortly thereafter, Cosmo received a telephone call from James DiPasquale informing Cosmo that because he went to the police, he was going to be killed. Cosmo was beaten severely on three occasions, paid thousands of dollars to Anthony DiPasquale, and testified he still feared for his life.

The second victim, James Kolzer, also was involved in a drug selling relationship with Anthony DiPasquale. The relationship began when Kolzer loaned Anthony $10,000 in December, 1980, to enable him to purchase chemicals to manufacture methamphetamine. After a failed manufacturing attempt, Anthony finally was successful in producing a large quantity of the drug. Despite a split of the proceeds in accordance with an agreement, Anthony insisted that Kolzer owed him $8000. As a result of Kolzer's having denied owing Anthony money and rather, stating that it was An-

thony who owed money to him, the methamphetamine partnership between Kolzer and Anthony DiPasquale terminated. Kolzer's next contact with any of the defendants was in early February, 1981, when he received a telephone call from August Redding. Redding said he was calling at the direction of Anthony DiPasquale who had been arrested and needed $8000 to get out of jail. Repeating his position from the December incident, Kolzer told Redding that Anthony owed Kolzer money and that he had no money for Anthony. Kolzer paid neither Redding nor Anthony DiPasquale on this occasion. In March, 1981, after discussing a renewal of the drug sales partnership with Anthony, Kolzer received a telephone call from Anthony directing him to meet Anthony at a Sunoco station in Philadelphia at 11:00 P.M. that evening. Thinking he was back in business with Anthony, Kolzer drove to the service station and there met Anthony DiPasquale and Victor Szwanki. Anthony entered Kolzer's car and directed him to drive to an auto body shop which was owned by Joseph West. When they finally gained access to the body shop,[7] Anthony told Kolzer to reach under a car in the shop to retrieve a bag which Anthony said he put there for Kolzer. Discovering that the bag was empty, Kolzer stood up and turned to see Anthony and Szwanki with guns drawn. Szwanki then searched Kolzer, tied his hands behind his back, forced him to kneel, and placed a bag over his head. Kolzer's hands and feet

---

**6.** When Cosmo testified that James DiPasquale said Anthony was in jail, counsel for Anthony DiPasquale moved for a mistrial arguing the Government should have informed the witness not to mention it. Contending no prejudice resulted from the statement, the Government stated that it lent credibility to Cosmo's testimony of James DiPasquale's demand for money. In refusing the motion for mistrial and agreeing with the Government's position, I noted that although the evidence was prejudicial, the prejudice was clearly outweighed by the probative effect. First, the incident in question occurred more than 2½ years prior to trial, and, therefore, there was no reason for the jury to conclude Anthony was still in jail. Counsel for Anthony DiPasquale then refused my offer to instruct the jury to disregard the testimony stating he did not want to highlight the evidence and that the proposed instructions had

no worth. For the reasons stated at trial, there was neither error in my refusing the motion for mistrial nor in abiding by counsel's wish that no cautionary instruction be given. *See United States v. Taylor,* 605 F.2d 1177 (10th Cir.1979); *United States v. Williams,* 604 F.2d 1102, 1126 (8th Cir.1979); *United States v. Burnett,* 582 F.2d 436 (8th Cir.1976); *Russell v. United States,* 429 F.2d 237, 239 (5th Cir.1970).

**7.** The body shop was owned by Joseph West. Kolzer testified that upon arrival there, the garage door was locked. Anthony then left, leaving Szwanki alone with Kolzer outside the body shop for 30 minutes. Anthony returned with West who opened the garage and remained there for the remainder of the night. West did not participate in the beating of Kolzer which followed.

were tied together and he was hit repeatedly in the back and head with a pipe. Despite claiming Kolzer owed $8,000, Anthony said it would cost more for Kolzer to get out of the body shop alive. First kneeling and then hung upside down on a chain attached to a hook, Kolzer was kicked and beaten continuously throughout the night. He was burned with a paint-drying lamp. During the beating, Kolzer was interrogated as to how he was going to raise the money and threatened with death. Though not admitting that he owed any money, Kolzer said he would telephone friends and relatives to get commitments for money.[8] At dawn apparently satisfied with Kolzer's efforts to raise $12,000 to $15,000, Anthony washed the blood from Kolzer and bandaged his face and hands. Anthony then ordered West to photograph Szwanki with his arm around Kolzer's shoulder. Kolzer was then taken from the body shop, first to a bar to make more telephone calls, and then to a row house where he heard Anthony and Szwanki talking about killing him. Instead of suffering that fate, Kolzer was taken to a Western Union office to pick up money wired to him from his son. After giving the money to Szwanki, Kolzer was taken to yet another bar to meet a relative who had gathered money for him pursuant to his telephone requests. When the money was given to Anthony, Kolzer was told he was free to leave. Anthony then kissed him, told Kolzer he was a "hell of a man," and that he had taken a "hell of a beating." Szwanki merely shook hands with Kolzer and laughed. Kolzer went home and then to the hospital, telling his family and physician he had been mugged at the train station in Trenton, New Jersey. Kolzer testified he had lied about the cause of his injuries because he was afraid of Anthony who had warned him of the consequences of telling the truth.

The third victim, Swain Crawford, was a used car salesman at John's Chevrolet, a Philadelphia automobile dealership which was owned by John and Peter Serubo. Crawford testified that on May 9, 1981, he left the building where he worked and went to the new car showroom to pick up his paycheck. After getting his check, Crawford saw Anthony DiPasquale [9] who told Crawford to go to John Serubo's office. In the office Crawford found John and Peter Serubo, Anthony DiPasquale, and an unidentified "burly" man. Soon after Crawford was told to sit down, Anthony DiPasquale punched him in the side of the head and asked why he had taken money from Peter Serubo. While John and Peter Serubo watched, Anthony continued to hit Crawford, eventually smashing a whiskey bottle over Crawford's head. Then, Peter Serubo told Crawford he owed $1800 to the Serubos. When Crawford denied owing the money, Anthony DiPasquale put a gun to Crawford's head. With the gun so aimed, Crawford telephoned a friend in an effort to raise the money.[10] Crawford's friend said she did not have the money and that she would have to telephone downtown to get it. Peter Serubo then directed the burly man to "get the old man," who Crawford identified as defendant Nicholas Fidelibus. When Fidelibus arrived at John Serubo's office and learned of the situation, he said they should break Crawford's legs and shoot him. At Anthony DiPasquale's direction, however, Crawford was taken by Fidelibus and the burly man to Joe West's auto body shop, the situs of Kolzer's beating. There, Crawford was given coffee, informed of several beatings administered at the body shop by Anthony DiPasquale, and told that he had nothing to worry about if he paid the money. Crawford then telephoned his friend again who told him she had a diamond ring valued at $1800. Crawford told this to Fidelibus who telephoned

---

8. For example, after a telephone call placed by Anthony, Kolzer's son in Florida agreed to wire $3000 to his father.

9. Crawford testified that he had known Anthony DiPasquale since they were children.

10. Hearing the request for money, Crawford's friend laughed. Crawford then stated he was in trouble and Anthony DiPasquale grabbed the telephone and confirmed that fact to Crawford's friend.

John Serubo to transmit the information. Upon finishing his conversation with John Serubo, Fidelibus announced they were going to get the ring. Crawford and Fidelibus obtained the ring and returned to John Serubo's office. Inspecting the ring, Anthony DiPasquale announced that if the ring was not worth $12,000, it was not worth Crawford's life.[11] Anthony then gave the ring to Peter Serubo and said that Crawford would return on Monday, May 11, 1981, with the $1800. As Crawford was released, he was warned by Anthony DiPasquale not to go to the police. Crawford did in fact return on May 11, 1981, with the money. He went to Peter Serubo's office and there found Peter Serubo and Hank Brown, the comptroller of John's Chevrolet. The three men then went to Brown's office and met John Serubo. Crawford paid the $1800 to the Serubos and the diamond ring was returned to him. Then, Peter Serubo asked Brown whether John's Chevrolet owed any commissions to Crawford. After Brown responded there was $200 due, Peter Serubo directed Brown to draw a check for $200 to Crawford who was in turn directed to endorse the check and give it back to John Serubo as payment to Anthony DiPasquale for collecting the $1800. Crawford testified that he did not owe the Serubos any money and that he did not go to the police because he feared for his life.

The last incidents about which testimony was received were neither listed in the indictment as substantive violations nor as overt acts committed in furtherance of the conspiracy. Because both occurred within the time period of the conspiracy alleged by the Government and were incidents similar in kind to those involving Messrs. Cosmo, Kolzer, and Crawford, they were admitted into evidence as further proof of the conspiracy.[12]

Francis Rosetti operated an automobile body shop and repair service in Philadelphia. On occasion, Mr. Rosetti purchased automobile parts from John's Chevrolet for use in his business. A few days after the Crawford incident,[13] John Serubo came to Joe West's body shop inquiring as to the whereabouts of Anthony DiPasquale. After West replied that Anthony was at home, he and Serubo left the body shop in separate cars and drove to Anthony's house. West, Serubo, and Anthony DiPasquale then got into Serubo's automobile and drove to a house on a back road in Bensalem, Pennsylvania. Anthony DiPasquale knocked on the door and spoke to a pregnant woman. When Anthony returned to the car, he commented that the woman had said Frannie did not live there anymore. As they drove back to Anthony DiPasquale's house, Anthony said they would get hold of Rosetti at his garage the next day. The following day, Anthony DiPasquale came to Joe West's body shop and said he was going to John Serubo's to find out how much money Rosetti owed to the Serubos. Shortly thereafter, Anthony returned with photocopies of bills evidencing Rosetti's debt to John's Chevrolet for auto parts and said to West, "Lets take a ride." They then drove to Rosetti's garage, found him, and went to a back room to discuss the debt. Rosetti immediately started to yell asking why they had scared his wife the day before. Anthony told Rosetti to shut up and that he owed money to John's Chevrolet. Despite Rosetti's assertion that he already had paid John's Chevrolet, Anthony said he was there to collect the money. Anthony DiPasquale and Joe West left Rosetti's garage without incident. A few days later, West attended a meeting in Peter Serubo's office with Peter and John Serubo, Anthony DiPasquale, Francis Rosetti, and Roset-

---

11. Anthony DiPasquale further directed that the ring be appraised. Fidelibus and Crawford went to a jeweler who refused to appraise it explaining that to do so he would have to disassemble the ring. Fidelibus and Crawford left the jeweler and Fidelibus stated he would tell Anthony and the Serubos the ring was valued at $1500.

12. Therefore, defendants' claim that this evidence was admitted improperly because it was separate from the conspiracy is meritless.

13. Special Agent Judith Tyler of the FBI established the date as May 13, 1981, from her surveillance reports.

ti's business partner. After considerable discussion, Rosetti agreed to pay the Serubos $5000 and they gave him two days to do so. Throughout the meeting Anthony DiPasquale and Rosetti yelled at each other regarding Anthony's visit to Rosetti's house. As the meeting ended, Anthony said to Rosetti, "next time it won't be so friendly." On the day payment was to be made, Anthony DiPasquale telephoned West and directed him to pick him up in West's car. West complied and they drove to Rosetti's house in Bensalem. At Anthony's direction, West knocked on the door and was given by Rosetti and his wife an envelope containing $5000 in cash. West gave the envelope to Anthony who counted out one half of the money, $2500, put it in his pocket, and directed West to give the rest to Peter and John Serubo. West did this after Anthony DiPasquale telephoned the Serubos to inform them that West would be there shortly with the money.

Mark Courtney was a salesman for a company which customized vans and a former sales manager for John's Chevrolet. In his position with the van company, Courtney dealt with John's Chevrolet and the Serubos. When employed at John's Chevrolet, Courtney had been introduced to Anthony DiPasquale by John Serubo who referred to Anthony as the man who took care of their problems. On June 3, 1981, John Serubo telephoned Courtney, told him that someone was at the car dealership interested in exporting a large quantity of customized vans and that Courtney should come there as soon as possible. Thinking that John Serubo was speaking of a profitable business venture, Courtney drove to John's Chevrolet and went to Peter Serubo's office where he found John and Peter Serubo, Anthony DiPasquale, Victor Szwanki, and another person. Peter Serubo told Courtney that John's Chevrolet was paying too much money for customized vans and that a

rival dealership paid less. When Courtney explained that the difference in price was due to the increased volume of business done by the rival dealership, Anthony DiPasquale hit him over the right eye with a half full whiskey bottle. Courtney was hit repeatedly by Anthony while Peter Serubo screamed that Courtney owed them $5000 because of the price differential for vans charged John's Chevrolet and the rival dealership. Anthony DiPasquale then took $300 from Courtney's wallet as payment for the "debt" collection and took him to the bathroom to wash off the blood on him from the beating. When Courtney returned to Peter Serubo's office, he was asked how he was going to get the money which Peter Serubo demanded by the next day. Courtney then left John's Chevrolet and telephoned his employer for the money.[14] The next day, Courtney returned to John's Chevrolet and gave the $5000 to Mr. Brown, the comptroller. Courtney further testified he did not go to the police because he would have been killed by one or more of the defendants.

*Severance*

Defendants contend I erred in not granting their pre-trial and mid-trial motions for relief from prejudicial joinder and severance. In their pre-trial motions, defendants first argued there had been a misjoinder of offenses and defendants under Fed.R. Crim.P. 8 because the facts alleged in the indictment revealed multiple conspiracies rather than the single conspiracy charged. Second, defendants moved for severance under Fed.R.Crim.P. 14 contending that because much of the Government's evidence focused on the acts of Anthony DiPasquale, the lead defendant who was charged in all counts of the indictment, they would be prejudiced by a spillover of evidence to them. In essence, they argued that the jury would not be able to compartmentalize the evidence as to each defendant.[15] There

---

**14.** Courtney testified that his employer owed him approximately $5000.

**15.** Additionally, James DiPasquale asserted that because he shared surnames with Anthony DiPasquale, the most culpable defendant, there

would be a prejudicial spillover of evidence. See *United States v. Sampol,* 636 F.2d 621 (D.C.Cir.1980). This argument is meritless. In *Sampol,* the prejudice to Ignacio Novo Sampol resulted from his being charged with making false statements rather than conspiracy to com-

was no error in my refusing defendants' motions.

■ Federal Rule of Criminal Procedure 8 states in its entirety:

(a) Joinder of Offenses. Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

(b) Joinder of Defendants. Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

A motion alleging misjoinder under Rule 8 is addressed to the pleadings. *Schaffer v. United States,* 362 U.S. 511, 514, 80 S.Ct. 945, 947, 4 L.Ed.2d 921 (1960); *United States v. Somers,* 496 F.2d 723, 732 (3d Cir.), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974). Furthermore, the Third Circuit has been consistent in finding that the good faith allegation of a single conspiracy satisfies the mandate of Rule 8 as it provides a common link between defendants and offenses. *United States v. Somers, supra,* 496 F.2d at 729–30. *See also United States v. Bloom,* 78 F.R.D. 591, 612–13 (E.D. Pa.1977) (citing *Somers*). Here, although not all named in each count of the indictment, each defendant was charged with having collected a debt by use of extortionate means in violation of 18 U.S.C. § 894(a), and conspiracy to do so. Therefore, they were charged with offenses "of the same or

similar character . . . [or with acts] connected together or constituting parts of a common scheme or plan," Fed.R.Crim.P. 8(a), and accordingly, the offenses were properly joined in the same indictment. As to joinder of defendants under Rule 8(b), notwithstanding that the defendants steadfastly contended the indictment charged multiple conspiracies, there was no allegation the Government had acted in bad faith in drafting the indictment. Furthermore, to accept defendants' argument at the pre-trial stage would have required me to prejudge the Government's evidence. Therefore, the defendants were properly joined pursuant to Rule 8(b) and I did not err in so ruling.

The court may grant a severance [pursuant to Fed.R.Crim.P. 14] when the defendant can show that the jury could not reasonably be expected to "compartmentalize" the evidence as it relates to him. *United States v. DeLarosa,* 450 F.2d 1057 (3d Cir.1971), and that the failure to sever clearly and substantially prejudices him to the point of depriving him of a fair trial. *United States v. Reicherter* [647 F.2d 397], *supra.* Where the Government charges multiple defendants with a single conspiracy, the interests of judicial economy usually favor a single trial. *United States v. Jackson,* 649 F.2d 967 (3d Cir. 1981). The possibility that evidence will be admissible against some but not all defendants does not require severance. *United States v. Kenny,* 462 F.2d 1205 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972).

*United States v. Dickens,* 695 F.2d 765, 778–79 (3d Cir.1982). Furthermore, defendants are not entitled to severance merely because the evidence may be more damaging against a co-defendant and there is the danger of spillover. *United States v. Boyd,* 595 F.2d 120, 125 (3d Cir.1978); *United States v. Dansker,* 537 F.2d 40, 62 (3d Cir.

mit murder as were the other defendants, that he was misidentified at trial for his brother, and that he headed the organization through which the conspiracy to commit murder was effectuated though he was uninvolved. *Sampol, supra,* 636 F.2d at 645–46. Under those circumstances it was unlikely that the jury would

have been able to compartmentalize the evidence against him. The situation here is inapposite to *Sampol.* First, both Anthony and James DiPasquale were charged with conspiracy. Therefore, all the acts of Anthony were chargeable against James. Second, there was no problem with misidentification.

1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977).

Here, there was no showing as to why the jury would not be able to compartmentalize the evidence as it pertained to each defendant. Rather, because the acts charged were separated by time and clearly defined in terms of place, date, victims, and persons present, there was every reason to believe the jury could compartmentalize the evidence. Additionally, the jury's ability to compartmentalize was proved by the verdicts acquitting Ferber on all counts and Fidelibus of conspiracy. There were four other reasons why I refused to grant severance which reaffirm my conclusion that I did not err. First, as stated previously, all defendants were charged with conspiracy. Therefore, not only did the general rule favor a joint trial, the interest of judicial economy strongly suggested that the defendants be tried together. This was especially true here where the proof was extensive, duplicative, and numerous witnesses were summoned. *United States v. Kulp,* 365 F.Supp. 747, 765 (E.D.Pa.1973), *aff'd mem.,* 497 F.2d 921 (3d Cir.1974). Second, to grant severance would have put the Government attorneys at a tactical disadvantage at subsequent trials because they would have been required to disclose their proof at the first one. Third, just because the proof against all defendants was not equal and one or more defendants would have had a better chance for acquittal if tried separately was no reason to grant severance. *United States v. Somers, supra,* 496 F.2d at 730; *United States v. DeLarosa, supra,* 450 F.2d at 1065; *United States v. Clark,* 398 F.Supp. 341, 354 (E.D.Pa.1975), *aff'd mem.,* 532 F.2d 745 (3d Cir.1976). Finally, the possibility of guilt by association and spillover of evidence from one defendant to another were not grounds for severance here where no extraordinary circumstances existed. *United States v. Boyd, supra; United States v. Bloom, supra,* 78 F.R.D. at 613. Therefore, there was no error in my refusing severance and accordingly, defendants' post-trial motions on these grounds must be refused.[16]

*Single v. Multiple Conspiracies*

Related to the severance issue and clearly the most repeated argument throughout the trial is the defendants' contention that the evidence revealed at least two and perhaps

---

**16.** Nicholas Fidelibus contends I erred in refusing his request for a non-jury trial and that I must grant him a new trial or judgment of acquittal because the verdict is inconsistent as to him. Neither assertion of error has merit. First, there is no constitutional right to a non-jury trial. *Singer v. United States,* 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965). *See United States v. Anderson,* 704 F.2d 684, No. 82–5410 (3d Cir. April 6, 1983) (right to jury trial can be waived only with agreement of both the government and the court). A non-jury trial can be compelled, however, if denial of it would result in denial of an impartial trial. *United States v. Braunstein,* 474 F.Supp. 1 (D.N.J. 1979). Fidelibus' motion for a bench trial essentially was a strategic decision to provide additional ammunition for his severance motion. His arguments in support of a bench trial mirrored the severance argument. As stated in the text, however, my refusal to sever Fidelibus did not result in his being deprived of a fair trial. Furthermore, Fidelibus' contention now that had he been severed and tried non-jury, he would have testified on his own behalf, comes too late. *See United States v. Reicherter,* 647 F.2d 397, 401 (3d Cir.1981) (burden on defendant to proffer to the court the details of his proposed testimony at time he moves for a

separate trial, and the reason he would be unable to testify if jointly tried). Second, the verdict was not inconsistent as to Fidelibus. Fidelibus contends that the only theory of his participation in the Swain Crawford incident presented at trial was as the "good guy," in a good guy—bad guy scenario. Necessary as a subordinate factual finding to this conclusion, was that Fidelibus entered into an agreement with another defendant to be the good guy. Fidelibus theorizes that because the jury found him not guilty of being a member of the conspiracy, it must have found he *did not agree* with any co-defendant to collect debts by extortionate means. Thus, he contends the verdict as to him, that he entered an agreement regarding a substantive offense but did not join the conspiracy, are inconsistent. I disagree. The verdict clearly demonstrates that the jury found Fidelibus to have entered a subplot or subagreement as to the Swain Crawford incident but that he did not knowingly join the overall, broad conspiracy. See *United States v. Simmons,* 679 F.2d 1042 (3d Cir.1982); *United States v. Boyd,* 595 F.2d 120 (3d Cir.1978); *United States v. Kenny,* 462 F.2d 1205 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). There is nothing inconsistent in this finding.

three separate conspiracies rather than one as charged in the indictment. Specifically, defendants argue the Government proved one conspiracy to collect debts by extortionate means from Anthony DiPasquale's drug selling relationships (Cosmo and Kolzer) and one involving the automobile dealership (Crawford, Rosetti, and Courtney). Asserting there was variance between the charge in the indictment and the Government's proof, defendants contend they were prejudiced by the joint trial and that I erred in refusing their motions for judgment of acquittal on the conspiracy count at the close of the Government's case in chief.[17] There was no prejudicial variance as suggested by the defendants, the Government proved the conspiracy charged in the indictment, and I did not err in refusing defendants' motions for judgment of acquittal.

▆▆ "When a pattern of illegal activity persists over an extended period of time, with participants moving on and off the scene of action, it is sometimes difficult to establish that they are all part of a single conspiracy." *United States v. Armedo-Sarmiento,* 545 F.2d 785, 789 (2d Cir.1976), *cert. denied,* 430 U.S. 917, 97 S.Ct. 1331, 51 L.Ed.2d 595 (1977). The Government, however, "may establish the existence of a continuing core conspiracy which attracts different members at different times and which involves different sub-groups committing acts in furtherance of the overall plan." *United States v. Simmons,* 679 F.2d 1042, 1050 (3d Cir.1982), quoting *United States v. Boyd, supra,* 595 F.2d at 123. *See United States v. Zemek,* 634 F.2d 1159, 1167 (9th Cir.1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981) (general test also comprehends the existence of subgroups or subagreements).

A single, continuing conspiracy is demonstrated where the evidence proves that the essential feature of the existing conspiracy was a common plan or scheme to achieve a common, single, comprehensive goal. *Blumenthal v. United States,* 332

U.S. 539, 557–559, 68 S.Ct. 248 [256–57], 92 L.Ed. 154 (1947). A single, continuing conspiracy is not transformed into a series of separate conspiracies merely because the Government's proof demonstrates that the conspiracy continued over a period of time or that the characters involved in the conspiracy changed over the course of time, or because there is a time gap in the Government's proof. *Braverman v. United States,* 317 U.S. 49, 52, 63 S.Ct. 99 [101], 87 L.Ed. 23 (1942); *United States v. Stromberg,* 268 F.2d 256, 263–264 (2d Cir.), *cert. denied,* 361 U.S. 863, 80 S.Ct. 123, 4 L.Ed.2d 102 (1959). A single continuing conspiracy may contemplate a series of offenses, or be comprised of a series of steps in the formation of a larger general conspiracy. *Braverman v. United States, supra,* 317 U.S. at 52, 63 S.Ct. (sic) [101] 99; *Blumenthal v. United States, supra,* 332 U.S. at 557–559, 68 S.Ct. (sic) 248 [256–57].

*United States v. Continental Group, Inc.,* 456 F.Supp. 704, 716 (E.D.Pa.1978), *aff'd,* 603 F.2d 444 (3d Cir.1979). *See also United States v. Watson,* 669 F.2d 1374, 1379–80 (11th Cir.1982); *United States v. Becker,* 569 F.2d 951, 960–61 (5th Cir.), *cert. denied,* 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978); *United States v. Armedo-Sarmiento, supra; United States v. Varelli,* 407 F.2d 735 (7th Cir.1969), *cert. denied sub nom., United States v. Saletko,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972) (principal factors considered were existence of common goal, nature of scheme, and overlapping of participants in the various dealings). "Another factor is the inherent nature of the criminal scheme." *United States v. Elam,* 678 F.2d 1234, 1246 (5th Cir.1982). For example, where the type of activity "is such that knowledge on the part of one member concerning the existence and function of other members of the same scheme is necessarily implied due to the overlapping nature of the various roles of the partici-

---

**17.** Had I granted the motions for judgment of acquittal, I would have had to grant severance because there would have been nothing left to link all defendants together and the prejudice flowing from the joint trial could not have been overcome by giving a jury instruction. *Kotteakos v. United States,* 328 U.S. 750, 773–75, 66 S.Ct. 1239, 1252–53, 90 L.Ed. 1557 (1946).

pants, the existence of a single conspiracy will be inferred. *Id.* citing *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). Finally,

> [S]till another factor is the interrelationships between the various parts and parties of the scheme. Where the memberships of two criminal endeavors overlap, a single conspiracy may be found. *United States v. Tilton,* 610 F.2d 302 (5th Cir.1980). Where members of one enterprise have knowledge, actual or implied, of the existence of members of a related enterprise, and where it is shown that a single "key man" was involved in and directed illegal activities while various combinations of other defendants exerted individual efforts toward a common goal, a finding of the existence of a single conspiracy is warranted. *United States v. Morado,* 454 F.2d 167 (5th Cir.1972). ... [This is not to] imply that the various members of a conspiracy which functions through a division of labor must have an awareness of the existence of the other members, or be privy to the details of each aspect of the conspiracy. *United States v. Brasseaux,* 509 F.2d 157 (5th Cir.1975). And for the purpose of determining whether a single conspiracy exists, a common plan does not become several plans simply because some members are cast in more vital roles than others or because certain members perform only a single, minor function; ... *United States v. Michel,* 588 F.2d 986 (5th Cir. 1979).

*United States v. Elam, supra,* 678 F.2d at 1246–47. *See United States v. Lemm,* 680 F.2d 1193, 1204 (8th Cir.1982).

■ Viewing the evidence in a light most favorable to the Government, the evidence revealed a single continuing conspiracy with Anthony DiPasquale, August Redding, and Victor Szwanki as core members. The first common characteristic of the conspiracy was for the defendants to lure the victims to some place, sometimes under pretext, which was convenient for beatings or threats. Michael Cosmo was lured to Anthony DiPasquale's farm in New Jersey and his house in Philadelphia, places Cosmo had frequented on numerous occasions and which were shielded from public view so as to facilitate the beatings. James Kolzer was lured first to a service station presumably to renew a drug selling relationship with Anthony DiPasquale, and then to Joe's Auto Body Shop to get the drugs. No harm to Kolzer occurred until he arrived at Joe's Auto Body, a place convenient for the beating because it was not open for business at the time. Swain Crawford, Francis Rosetti, and Mark Courtney were lured to private offices at John's Chevrolet presumably to discuss business. Second, each victim knew one or more of the defendants: Michael Cosmo knew Anthony and James DiPasquale, August Redding, and Victor Szwanki; James Kolzer knew Anthony DiPasquale, Victor Szwanki, and August Redding; Swain Crawford knew Peter and John Serubo, and Anthony DiPasquale; and Francis Rosetti and Mark Courtney knew the Serubos and Anthony DiPasquale. Third, in each instance there was a claim of a debt and a denial of the same by each victim. Fourth, there was initial violence in the form of striking and beating, or violence was threatened. Michael Cosmo's September, 1979, incident involved both. First he was warned by Redding what would happen if he did not pay money to Anthony and then he was hit with a rifle. The second incident with Cosmo only involved threats of violence made by Anthony DiPasquale. The December, 1979, and January, 1980, beatings involved immediate physical violence. James Kolzer also was beaten immediately, though he was warned repeatedly through the night of continued physical harm if he refused to pay the claimed "debt". Swain Crawford first was beaten by Anthony DiPasquale, and then warned by Anthony and the Serubos of future violence. Rosetti was only threatened with violence by implication, though the threat also was directed to Rosetti's wife and unborn child. Finally, Courtney was beaten initially and threatened with additional harm if he did not pay the "debt." Fifth, there was always a claim that a debt was due and owing to reinforce the demand for

money. Sixth, although payment was made within one to two days of the beating or threat, immediate payment in cash was demanded of each victim. Seventh, each victim was warned of further violence, or the likelihood of violence, if he reported the beating to anyone, especially law enforcement authorities. Eighth, during each incident, several other persons were present, thus minimizing the chance for escape or resistance. Finally, there were common personnel in each incident. As regards Michael Cosmo: August Redding and Anthony DiPasquale played key roles in the September, 1979, incident; Anthony DiPasquale telephoned Cosmo in November, 1979; Anthony DiPasquale, Victor Szwanki, and August Redding beat Cosmo in December, 1979; and James DiPasquale and Victor Szwanki led the January, 1980, incident. James Kolzer received a telephone call from Redding in February, 1981, demanding money for Anthony DiPasquale, and Kolzer was beaten in March, 1981, by Anthony DiPasquale and Victor Szwanki. The actors in the Swain Crawford incident in May, 1981, were Anthony DiPasquale, John and Peter Serubo, and Nicholas Fidelibus. Courtney's assailants were Anthony DiPasquale and Victor Szwanki. Finally, John Serubo and Anthony DiPasquale were involved in the Francis Rosetti incident.

Most important to the finding of a single conspiracy, was the existence of a common goal. Here, in each instance, the demand was for money, not drugs, property, political favors, or anything else of value. In this respect, this case is much like *United States v. Kenny,* 462 F.2d 1205 (3d Cir.), *cert. denied,* 409 U.S. 914, 93 S.Ct. 233, 34 L.Ed.2d 176 (1972). In *Kenny, supra,* the conspiracy was comprised of a group of persons, who repeatedly cooperated to achieve the common purpose of self-enrichment by extracting kickbacks. *Kenny, supra,* 462 F.2d at 147. The key to success was their common control over the administration of city and county government under the leadership of J.V. Kenny. *Id.*

Here, there also was a pattern of conduct by a determined group of persons, repeatedly cooperating to achieve the common purpose of self enrichment. First, the evidence shows that most of the various defendants knew each other, and all knew Anthony DiPasquale. Second, the key to their success was their ability to select victims thought or known to one or another of them to be vulnerable, and then, through the leadership of Anthony DiPasquale, to bring physical threats and pressure upon these persons. Moreover, though not appearing to be connected, the success of one incident transmitted to other victims, aided the success of subsequent incidents adding psychological pressure to the physical violence. Finally, there was testimony as to statements of some of the defendants which tend to prove the existence of a single conspiracy. For example, James Kolzer testified that in the summer or fall of 1980, Anthony DiPasquale, in the presence of August Redding, told Kolzer how he had taken money from other persons and how he had hit them. Anthony DiPasquale also demonstrated the iron claw, a torture device, on Kolzer. Swain Crawford testified that when he was taken to Joe West's body shop, he was told by Fidelibus and West of other beatings that had occurred at the body shop. Lastly, Mark Courtney testified that at the time John Serubo introduced him to Anthony DiPasquale when Courtney was a manager at John's Chevrolet, Serubo said that Anthony was the man who took care of their "problems." Courtney further testified that during his brief period of employment at John's Chevrolet, he saw Anthony DiPasquale there on 5–10 separate occasions. The above testimony is important to a finding of a single conspiracy because: 1) it demonstrates that Anthony DiPasquale admitted participating in other beatings; 2) that Fidelibus, though not a member of the overall conspiracy, was familiar with the fact that there had been other beatings; and 3) that John Serubo used Anthony DiPasquale's services on a regular basis to take care of his "problems" which on various occasions included collecting money. All this boils down to showing the other conspirators knew of the acts and tactics of Anthony DiPasquale in extorting money

and participated in similar activity with him.

For all of the reasons above, I did not err in concluding that the jury could find a single, continuing conspiracy, and the jury did not err in doing so. Accordingly, there was no variance between the proof and the indictment.[18]

*Evidentiary Rulings*

The defendants assign error to several of my evidentiary rulings.[19] No error was committed in admitting the evidence in question. I will discuss defendants' objections *seriatim.*

Shortly before trial, the Government notified me by letter of its intention to present testimony of Michael Cosmo's and James Kolzer's drug selling relationships with Anthony DiPasquale. The Government contended that evidence of events preceding the beatings of Cosmo and Kolzer was relevant to show why the beatings may have occurred and to put the incidents in context. After much discussion in open court, I ruled the evidence was relevant, admissible under Federal Rule of Evidence 404(b), and that its probative value outweighed any prejudice flowing from its admission. There was no error in my ruling and I adhere to it.

■■■ Relevant evidence is defined as evidence having a tendency to make the existence of a fact of consequence more or less probable. Fed.R.Evid. 401. In general, matters which show a prior background of acquaintanceship, or the nature and existence of a relationship, between persons charged with an offense and persons who are witnesses are relevant. *United States v. Simmons,* 679 F.2d 1042, 1050 (3d Cir.

1982). Under Federal Rule of Evidence 404(b), evidence of other crimes, wrongs, or acts may be admitted to show, *inter alia,* proof of motive, opportunity, intent, plan, knowledge, or identity. So called 404(b) evidence should be excluded, however, if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or the jury's being misled.

■■■ Here, I properly concluded that the evidence at issue was highly probative as to Anthony DiPasquale. First, it was relevant to Cosmo's and Kolzer's identification of him before the jury. Specifically, testimony of a prior business relationship with Anthony DiPasquale made Cosmo's and Kolzer's identification of him more persuasive than if he had been a total stranger to them prior to the beatings about which they testified. Second, the evidence was relevant to Anthony's knowledge, i.e., testimony about the prior business relationships and drug dealings may have shown how Anthony knew Cosmo's and Kolzer's personal characteristics, financial backgrounds, and their access to large sums of cash. The evidence was also probative of opportunity. Because the activity which Cosmo and Kolzer had shared with Anthony DiPasquale was illegal, they had something to hide, and thus were less likely to go to the police after the beatings. Accordingly, they might well be considered a safe target for extortion.

Certainly, this evidence was prejudicial to Anthony DiPasquale because he was not charged with a drug offense and drug dealers and manufacturers are generally thought of as bad people in our society. On the other hand, drug offenses are completely different from extortion, and thus it was

---

**18.** If there was a variance, it was not material because there was little or no spillover of evidence from one incident to another. The evidence was presented in a way such that it was clear to the jury that the events in question involved definite times, places, persons, statements, and actions. In almost every instance, people were identified by name by other people who had known them for months and years prior to the times in question. Finally, there was no mixing of one event with another. *See United States v. Brooks,* 697 F.2d 517, 523 (3d

Cir.1982) (if variance affected substantial rights of the accused, it is prejudicial and conviction must be reversed).

**19.** Defendants also contend I erred in admitting hearsay testimony. Because defendants have neither specified the testimony to which they are referring nor submitted briefs explaining their positions on this issue, I can only assume the testimony was either admitted properly or did not prejudice them.

less likely that the jury would be influenced to find him guilty of extortion because he was involved with illegal drugs. Accordingly, I did not err in concluding that the probative value of the evidence was not substantially outweighed by its prejudicial effect as to Anthony DiPasquale.

■ The other defendants argued that the evidence was prejudicial to them because any negative impact on Anthony DiPasquale necessarily spilled over to them. In short, they argued the jury could not compartmentalize the evidence. That argument was properly rejected for the following reasons. First, the evidence showed that only Anthony DiPasquale participated in drug activity, not the other defendants. That fact could have been and was emphasized in speeches and on cross examination. Second, the evidence was very detailed and precise in its reference to Anthony DiPasquale. Thus, there was no possibility of confusion with the other defendants. Finally, it does not follow logically that because Anthony DiPasquale was involved in drugs with Cosmo and Kolzer, he was involved in similar relationships with one or more of the other defendants. Accordingly, there was no reason for the jury to tie the other defendants to Anthony DiPasquale's drug activity. Therefore, because the evidence was highly probative as to Anthony DiPasquale and there is every reason to believe that the jury was able to consider it only for the purpose intended, the other defendants were not substantially prejudiced and there was no error in receiving it.

■ Another 404(b) problem arose when the Government sought to introduce statements made by James DiPasquale that he intended to harm one or more of the witnesses in this case and that he displayed to a third party a photograph of Szwanki and Kolzer shortly after Kolzer was beaten.

Contrary to defendants' assertions, I did not err in concluding that the probative value of the evidence was not substantially outweighed by its prejudicial effect.

■ Evidence of conduct designed to impede or prevent a witness from testifying is admissible to show consciousness of guilt. *United States v. Cirillo,* 468 F.2d 1233, 1240 (2d Cir.), *cert. denied,* 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1972). *See also United States v. Gonsalves,* 668 F.2d 73 (1st Cir.1982); *United States v. Monahan,* 633 F.2d 984, 985 (1st Cir.1980). Here, I concluded that the evidence was highly probative and that it fell within the boundaries of Rule 404(b) because it tended to show consciousness of guilt on the part of James DiPasquale. The photograph was probative because it corroborated West's testimony that Anthony DiPasquale took polaroid photographs of Szwanki and Kolzer after Kolzer was beaten and because it showed Szwanki and Kolzer together. James DiPasquale was prejudiced by this evidence because it showed that he was potentially a man of violence. In view of the fact that much of the evidence at trial depicted brutally violent beatings, however, I properly concluded that the prejudicial effect of this evidence did not outweigh its probative value. As to the other defendants, the issue was whether the jury could segregate the evidence and consider it only as to James DiPasquale. *See United States v. Franks,* 511 F.2d 25 (6th Cir.1975). Clearly there was no error in the jury's having considered this evidence for a limited purpose and only as to James DiPasquale. First, the evidence related to a specific incident involving only James DiPasquale and the direct comments that he made. Second, I gave a limiting instruction to the jurors just prior to their hearing the testimony.[20] There-

---

**20.** I gave the following limiting instruction at this time substantially adopting an instruction given in *United States v. Gonsalves, supra,* 668 F.2d at 74–75:

Members of the jury, in the testimony of this witness you are about to hear evidence of a statement which was made by James DiPasquale. This evidence is received for a limited

purpose. First of all, you may not consider it against any other defendant. Secondly, you may consider this evidence only as a circumstance tending to show consciousness of guilt of the offense charged in this indictment on the part of James DiPasquale, if you so interpret it. You are not to consider this evidence for any other purpose. You are also instructed that

fore, not only by its very nature did the evidence only involve James DiPasquale, but I instructed the jury as to whom it could be considered and for what purpose. There was no error in this ruling.[21] *See United States v. Cirillo, supra; United States v. Gonsalves, supra; United States v. Monahan, supra.*

> the receipt of this evidence does not in any way alter the presumption of innocence and the government's burden of proof beyond a reasonable doubt.
>
> It is for you, the jury, to determine whether you believe the evidence, and if you do, what weight and significance you accord it as evidence of a consciousness of guilt on the part of James DiPasquale.

21. Alternatively, I considered this evidence probative for another, independent reason. The government's witness, Michael Cosmo, testified he was afraid to go to the police after his beatings—and it was not until urged by his aunt and family that he finally did go and even then, he refused to sign a complaint. There was cross-examination of Cosmo, the purpose of which was to discredit his statements about fear. In general, this cross examination was designed to show that Michael Cosmo still lived in the neighborhood, or close to the neighborhood, where Anthony DiPasquale lived and that his parents still had a store in that general neighborhood.

 The questions about where Mr. Cosmo stayed from time to time, where his aunt lived, where his parents lived and had their store, the questions about distances from one place to another, the questions about Cosmo's owning a shotgun, the questions about where the DiPasquales lived, etc., were asked for only one reason—to establish that Cosmo was not afraid to remain in the same neighborhood where James DiPasquale lived. If the jury concluded he was not afraid to live and work in that neighborhood, it could be argued that he did not fear James DiPasquale because in fact he had never been beaten or that someone else had beaten him. In any event, it would cast doubt on Cosmo's credibility, tend to establish that he had nothing to fear from James DiPasquale, and tend to show that James DiPasquale would not resort to violence. In a very real sense, this evidence was evidence of the good character of James DiPasquale and Anthony DiPasquale.

 The evidence offered by the Government would tend to rebut those inferences as to James DiPasquale. Therefore it was probative.

 Rule 404(a) provides that evidence of a person's character or a trait of his character is not admissible for the purpose of proving he acted in conformity therewith on a particular occasion, except

Finally, defendants contend I erred in admitting evidence about the incident involving Francis Rosetti because it occurred after the termination of the conspiracy and did not involve any extortionate means to collect a debt. I disagree and conclude that the evidence was admitted properly.[22]

> (1) Character of accused—Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;

I ruled that the evidence offered by the government would tend to rebut evidence of a pertinent trait of character of James DiPasquale; that he was a non-violent man.

The next question was how character could have been proven. Rule 405(b) provides that in cases in which character or a trait of character is an essential element of a charge, claim, or defense, proof may be made of specific instances of his conduct.

As I previously noted, I concluded that the evidence was probative—for this second reason—and that as previously stated its probative value was not substantially outweighed by its prejudicial effect.

Whether based on Rule 404(b), as explained in the text, or on 404(a)(1) and 405(b), there was no error in my ruling.

22. Defendants also argue that I erred in not requiring the Government to disclose pretrial its intention to offer into evidence both the Courtney and Rosetti incidents as requested in defendants' motions for discovery and bills of particular. There was no error. First, defendants are not entitled to a script of the Government's evidence. *United States v. Addonizio,* 451 F.2d 49, 62 (3d Cir.1971), *cert. denied,* 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). Second, as to the Courtney incident, the Government attorneys informed the court and the defendants on Friday, November 5, 1982, of the proposed testimony which was to be offered on Monday, November 8, 1982, explaining that they had not disclosed it previously because of danger to Mr. Courtney. That left the entire weekend for investigation by the defendants, and indeed, John and Peter Serubo did put on a substantial defense to Courtney's testimony. Thus, assuming without deciding that I did err in refusing to require the Government to disclose the incident pre-trial, there was no prejudice to the defendants in my not having done so. Additionally, in view of the fact that there was a security risk in disclosure, I would not have disclosed either the incident or Mr. Courtney's name had I known of them pretrial. As to Rosetti, there was no error in not requiring the Government to disclose the incident pretrial because the defendants did not

First, as I explained regarding the Courtney incident, because the indictment states that the conspiracy continued until the date the indictment was filed, the Rosetti incident too falls within the time period of the conspiracy. See note 12, *supra.* Second, because it involved a collection of a debt by use of extortionate means, the Rosetti incident was evidence in furtherance of the conspiracy. It cannot be disputed that Rosetti first denied owing money to John's Chevrolet and later agreed to pay the Serubos $5000 in satisfaction of the "debt." Thus, there was a repayment of an extension of credit within the meaning of title 18, United States Code, section 891(4) (1976).[23] Furthermore, [A]n extortionate means is any means which involves the use, or an *express or implicit threat of use, of violence* or other criminal means *to cause harm to the person,* reputation, or property of any person." 18 U.S.C. § 891(7) (1976) (emphasis supplied). In the Rosetti incident, although there was no testimony as to the exact words used by Anthony DiPasquale to Rosetti's wife, Joseph West testified that the following day Rosetti complained to DiPasquale that he had scared Rosetti's wife to death. Therefore, it is obvious that when Anthony DiPasquale went to Rosetti's house he made an "... express or implicit threat of use of violence ...." 18 U.S.C. § 891(7). Additionally, when Rosetti, his partner, John and Peter Serubo, Anthony DiPasquale, and Joseph West, met at John's Chevrolet, Rosetti and DiPasquale continued to argue about the incident involving Rosetti's wife, and DiPasquale finally retorted, "next time it won't be so friendly." Certainly, an inference can be drawn that DiPasquale was then threatening Rosetti explicitly and that DiPasquale, either im-

plicitly or explicitly, had threatened Rosetti's wife on the prior occasion. Accordingly, the Rosetti incident did involve "extortionate means" by Anthony DiPasquale and was properly admitted into evidence.[24]

*Exceptions to the Charge of the Court*

The defendants except to the way in which I defined for the jury the offense charged, an extortionate means to collect an extension of credit.

As previously related, a significant part of the testimony in this case involved the beating of four men, Michael Cosmo, James Kolzer, Swain Crawford, and Mark Courtney. There was no evidence that prior to the beatings of Cosmo and Courtney any demand had been made upon either of them for the payment of an alleged debt. So far as Kolzer was concerned, there was evidence that Anthony DiPasquale contended Kolzer owed him $8000 and that August Redding had demanded payment from Kolzer. As to Crawford, there was no evidence of a prior demand although the possibility of his owing John's Chevrolet money was a matter he and the Serubos had discussed.

In essence, the defendants contend there can be no extortionate means to collect an extension of credit in the absence of some pre-existing claim. My instructions to the jury to just the opposite effect form the basis of defendants' exceptions to the charge.

I told the jury the law forbids the use of any extortionate means to collect an extension of credit. I then defined "collect" to mean in any way to induce a person to make a payment of money.[25] I said that "extortionate means" involves the use of violence to cause harm to someone—or it

---

dispute that the incident occurred, only that it was an attempt to collect a debt by use of extortionate means. There has been no suggestion that had defendants learned of the evidence prior in time to when they did, their defenses would have been different. Thus, they have shown no prejudice.

23. The repayment of any extension of credit includes the repayment, satisfaction, or discharge in whole or in part of any debt or claim, acknowledged or disputed, valid or invalid, re-

sulting from or in connection with that extension of credit. 18 U.S.C. § 891(4) (1976).

24. The Rosetti incident also was relevant to the conspiracy charge because it showed continued association by some defendants: John Serubo, Anthony DiPasquale, and Joseph West.

25. To collect an extension of credit means to induce in any way any person to make repayment thereof. 18 U.S.C. § 891(5).

may involve the threat, implicit or explicit to cause harm to someone by the use of violence.[26]

Finally, I said that to extend credit means to enter into any agreement, tacit or express, whereby the repayment of a debt or the satisfaction of a claim will be deferred. I told the jury it made no difference whether the debt or claim in question is valid or invalid, acknowledged or disputed, or how it may have arisen.[27] I said that the sequence of events is not important and that the question is whether there was violence, some claim of indebtedness, and an agreement to accept payment at some other time.

In *United States v. Keresty,* 465 F.2d 36, 40 (3d Cir.) *cert. denied,* 409 U.S. 991, 93 S.Ct. 340, 34 L.Ed.2d 258 (1972), Judge Hunter pointed out that the statutory language and legislative history support a broad interpretation of the act which forbids extortionate means to collect extensions of credit. Specifically, Judge Hunter said:

Our reading of the legislative history supports the conclusion that Congress intended to attack the economic base of organized crime and therefore did not restrict its efforts to those financial dealings which necessarily included each of the various attributes of a loan shark transaction. In a section entitled "General Applicability" Congress stated:

"The full utility of chapter 42 as a weapon in the war on organized crime obviously cannot be assessed until it has been tested in battle. Some general observations however, appear to be in order at this point. *As noted above, it is not, and is not intended to be, a Federal usury law, nor does it have anything to do with interest rates as such.* It is, rather, a deliberate legislative attack on the economic foundations of organized crime.

*Most of the business of the underworld, whether in loan sharking, gambling, drugs, 'protection,' or other activities, involves extensions of credit as refined (sic) in section 891 at one or more stages.* The methods used in the enforcement of such obligations are notorious. Thus, a very large proportion of underworld financial transactions fall within the ban of one or more of the provisions of chapter 42. It may very well develop that this chapter will find as much usefulness in the investigation and prosecution of transactions entirely within the world of organized crime as it does in connection with transactions between those within that world and those who are otherwise outside it. *Be that as it may the conferees wish to leave no doubt of the congressional intention that chapter 42 is a weapon to be used with vigor and imagination against every activity of organized crime that falls within its terms."* 1968 U.S.Cong. & Adm.News, p. 2029. (Emphasis added). (Footnotes omitted, emphasis added by Judge Hunter).

465 F.2d at 40.

The difference between what I told the jury and what the defendants say I should have told the jury is the difference between whether there had to have been an extension of credit on a prior occasion and then a beating on the day in question as contrasted with an extension of credit and a beating on the same day.

Somewhat the same argument was raised in *United States v. Czarnecki,* 552 F.2d 698 (6th Cir.), cert. denied, 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977). There the defendant contended that the phrase "extension of credit" involved a bilateral agreement to extend a debt, a definite debt and a specific extension period, and consideration supporting the extension agreement. The court held that there was no basis for in-

---

**26.** An extortionate means is any means which involves the use, or an express or implicit threat of use, of violence or other criminal means to cause harm to the person, reputation, or property of any person. 18 U.S.C. § 891(7).

**27.** To extend credit means to make or renew any loan, or to enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred. 18 U.S.C. § 891(1).

cluding any of those elements in the phrase "extension of credit."

In *United States v. Briola,* 465 F.2d 1018 (10th Cir.1972), the evidence would have justified the conclusion that a man named Meyer admitted responsibility to pay a gambling debt to the defendant. After Meyer was then beaten, he agreed to obtain money from his parents to pay the debt. He was then beaten again. The court held that the real thrust of the legislation involved here is directed to the use of extortionate means in order to collect moneys which the creditors maintain are owing to them, regardless of whether the loan arose from a traditional type of loan or resulted from the assumption of responsibility as the result of force or threats. The court pointed out that the evidence would justify a finding that the debt arose prior to the first meeting. It went on to say, however,

> The defendant-appellant seeks to avoid responsibility by questioning the time sequence of the creation of the debt and the beating. *He would have criminal responsibility turn on whether the beating was administered immediately before or immediately after the creation of the promise to pay.* This analysis must fail, first, because the evidence, as previously noted, is sufficient to support a finding that the debt arose prior to the first beating. Apart from that, we are impressed that the series of events constituted a single transaction within which the acknowledgment of the debt and the extortionate means were substantially contemporaneous. That, to our way of thinking, is sufficient. As noted, the essence of the offense is the use of force or threats for the purpose of extorting money. If the crime is made to turn on specific sequence, it introduces an artificial standard which robs the definition of the offense of its substantiality. (emphasis added).

465 F.2d at 1021–22.

■ In view of the fact that this act is to be interpreted broadly and in view of the fact that it does not require any specific sequence of events, there was no error in my charge.

■ The defendants also except to part of my conspiracy charge in which I instructed the jurors they could find one conspiracy existed even if they also found one or more subconspiracies were contained within the larger, overall conspiracy.

In charging the jury regarding the existence of a single conspiracy as set forth in the indictment or multiple conspiracies as suggested by the defendants, I stated:

> Bear in mind that the Government may have proven that the conspiracy charged in the bill of indictment existed and may have also shown that there were separate crimes, separate acts, and even separate supporting conspiracies. That would not be inconsistent with an overall agreement. In other words, there may be a single overall conspiracy supported by subgroups or subagreements.... Various people knowingly joining together in furtherance of a common design or a common purpose constitute a single conspiracy. If there is no common purpose or no common design, the fact that certain people are involved does not make it a single conspiracy.... Multiple conspiracies exist on the other hand when there are separate agreements to effectuate distinct purposes. N.T. 13.80–82.

■ The above quoted instruction is a correct statement of the law of conspiracy.

> The general test [for a single conspiracy] is whether there was 'one overall agreement' to perform various functions to achieve the objectives of the conspiracy. Performance of separate crimes or separate acts in furtherance on a conspiracy is not inconsistent with a 'single overall agreement.' The general test also comprehends the existence of subgroups or subagreements.

*United States v. Zemek, supra,* 634 F.2d at 1167 (citations omitted). *See United States v. Abushi,* 682 F.2d 1289, 1299–1300 (9th Cir.1982); *United States v. Brock,* 667 F.2d 1311, 1317 (9th Cir.1982). The key issue in determining that a single conspiracy existed where the evidence also establishes the ex-

istence of subgroups with subagreements is whether the acts of the subgroups were committed in furtherance of the overall plan of the broader, single conspiracy. *United States v. Simmons, supra,* 679 F.2d at 1050; *United States v. Boyd, supra,* 595 F.2d at 123. My instruction correctly stated the applicable law when the evidence could support a finding of separate conspiracies or a single one. First, I explained that a single conspiracy could be comprised of subgroups or subagreements. Then, however, I emphasized that under the circumstances, the jury could find a single conspiracy only if there was a common purpose or design shared among the subgroups and that they should find multiple conspiracies existed if the separate agreements were entered to achieve distinct purposes. The defendants' position here is similar to that of the defendants in *United States v. Perry,* 550 F.2d 524 (9th Cir.1977). Affirming the trial court's refusal of a proposed instruction *requiring* a verdict of not guilty if the jury found two or more disconnected conspiracies, the United States Court of Appeals for the Ninth Circuit stated:

> We find that this multiple conspiracy instruction [proposed by defendants] incorrectly states the law and the trial court, therefore, properly refused it. The crucial point that defendants miss in this case is the fact that the jury could find that there were several different agreements involving the defendants, all of which would then connect the defendants to the general overall conspiracy as charged in the indictment. The govern-

ment does not have to prove that all of the defendants met together at the same time and ratified the illegal scheme. This just is not the nature of a conspiracy, especially a large narcotics smuggling and distribution organization as we have here. Generally, the defendants are going to meet and conspire in twos or threes in order to carry out the design of the common overall scheme. To suggest that defendants should be acquitted of the general conspiracy charge just because some of them met singly with other defendants and conspired with them to carry out the overall common distribution plan is a misapplication of the law of conspiracy. By these separate agreements the defendants became parties to the larger common plan, joined together by their knowledge of its essential features and scope, though not of the exact limits, and by their single goal. These agreements were merely steps in the formation of the larger and more general conspiracy.

*United States v. Perry, supra,* 550 F.2d at 532–33 (citations omitted).

There was no error in my charge.[28]

*Improper Summation*

■ Defendants final contention is that Assistant United States Attorney Ronald G. Cole, co-counsel for the Government acted improperly during summation by equating the jury's belief in the credibility of the United States, the prosecutors, and the FBI with a finding of the defendant's guilt.

[28]. Defendants pose two further objections to my charge both of which are meritless. In charging generally regarding the credibility of witnesses, I instructed in essence that the jurors could either disbelieve all of a witness' testimony if they found he lied once, or they could examine carefully the witness' entire testimony and choose what to believe and disbelieve. I further explained that the latter course seemed to be the more sensible of the two. Defendants have neither explained what I should have done differently nor how they were prejudiced by the instructions as given. My instruction correctly stated the law and did not force the jury to adopt one course over the other. Accordingly, there was no error.

Defendants also objected to my refusal to instruct the jury that the evidence regarding Mark Courtney could not be used to show a particular defendant committed a prior act of the same nature. Such an instruction may have been proper if evidence regarding the Courtney incident was admitted pursuant to Federal Rule of Evidence 404(b). Here, however, the evidence was admitted to prove the existence of the conspiracy as charged and not for a limited purpose as suggested by defendants. In fact, the Government never contended that participation in the Courtney incident tended to prove participation in the Crawford incident. Therefore, a limiting instruction as to the use of said evidence would have been improper.

Specifically, in the rebuttal portion of summation, Mr. Cole stated:

> I was itching for the opportunity to respond to their challenge because both of them made some very serious accusations, accusations against Agent Kalletta, accusations against Mrs. Colburn [co-counsel for the Government], and accusations against me and I'm here to respond to that challenge.

> . . . . .

> ... but Mr. Scandone and Mr. McAteer went beyond that. They accused Agent Kalletta, Mrs. Colburn and me of something that's very serious. They have suggested to you, members of the jury, that the victims came into this courtroom and lied under oath, and you know what that is? That is perjury, and you know what perjury is? It's a felony, and you know what it is when somebody takes the stand and perjures himself? That's called subornation of perjury. That's a felony and that's what they accused [us] of.

> Now I'm making a proposition to you because I'm absolutely confident of what your choice will be. If you think that Agent Kalletta or Mrs. Colburn or I is capable of doing something like that to convict these defendants, then it should take you about five minutes to acquit every one of them. But let's take it one step further. Let's take a look at it. Let's look at that testimony, this fairy tale that Mr. McAteer has suggested we conjured up and enter into this fairyland that Mr. McAteer lives in.

N.T. 13.21–23.

Mr. Cole concluded the Government's rebuttal by saying:

> I submit to you, members of the jury, the evidence is overwhelming. The evidence is overwhelming. I ask you to return not only a verdict of guilty but a swift verdict, a verdict that will tell these defendants, "We do not condone what you did," and a swift verdict will tell Mr. McAteer and Mr. Scandone, "We don't

agree with your allegations of misconduct by Agent Kalletta, Mrs. Colburn and me. N.T. 13.36.

During summation a prosecutor can hit "hard blows" but he can neither put his own credibility in issue nor put the sanction of his office behind the testimony of the witnesses. *United States v. West,* 680 F.2d 652, 656 (9th Cir.1982); *United States v. Dorr,* 636 F.2d 117, 119–20 (5th Cir. Unit A 1981); *United States v. Praetorius,* 622 F.2d 1054, 1060–61 (2nd Cir.1979), *cert. denied sub nom. Lebel v. United States,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980); *United States v. Somers, supra,* 496 F.2d at 740–41. When defense counsel attacks the prosecutor's credibility or the credibility of government agents, however, the prosecutor is entitled to respond with rebutting language suitable to the occasion which otherwise would be improper. *United States v. Dorr, supra; United States v. Praetorius, supra; United States v. Somers, supra.*

Here, as in *Praetorius,* Mr. Cole responded to what

> he quite reasonably believed to be attacks on the integrity of the government's case, and which impugned the good faith of the entirety of the government's agents, witnesses, and prosecutorial staff. The record indicates that there were numerous instances of the defendants' attorneys suggesting that the prosecution was engaging in some sort of "frame up," or at least were being duped by the ... [victim] witnesses.

*United States v. Praetorius, supra,* 622 F.2d at 1061. For example, in his closing argument on behalf of John Serubo, Robert McAteer, Esquire, stated of Joseph West's and Mark Courtney's testimony:

> He pleaded guilty to a crime he didn't commit, although this same indictment accuses him of being a co-conspirator. He sat on the witness stand and told you he didn't do one of the singular things in that indictment that he was charged with, but pleaded guilty anyway. He made a deal with the Government and it was after that deal was consummated

that *he said he would testify for the Government on behalf of the Government and the way the Government wished him to testify.*

.    .    .    .    .

By the way, everything Mark Courtney said to you was not a lie. *Only parts of his testimony were fabricated, and I suggest to you he had help. He didn't do it alone.*

N.T. 12. Similar comments were made by counsel for Anthony DiPasquale. For example, of James Kolzer and the Government, Robert Scandone, Esquire, stated:

Does it affect you in any way that the Government picks and chooses what they want? Does he have immunity, ladies and gentlemen of the jury? Well, if he doesn't have immunity why isn't he arrested for the crime? And you know why, because the agreement if very simple: "Say what we want to hear." Then you get both: "Say what you want to say." "Say what we want to hear, and you have no problem. Get us Anthony DiPasquale and we don't care what you are doing."

N.T. 12.60–61. Mr. Scandone further stated:

A script. It's an absolute script directed by the Government. You have been invited by (sic) a play. The problem is no one else is invited here. Just you 12 people are here for one simple reason, because the Government wants you to believe this man is guilty of a crime. Or, ladies and gentlemen of the jury, is the

scenario more realistic to believe what occurred in this case was the FBI said, "We want Anthony DiPasquale." They searched out these four people and said to Kolzer, "What is important is 'owe money.' This is what you have to say because we've got to search through our little book here and find out what the federal crime could be.

N.T. 12.65, 67.

It cannot be disputed in good faith that counsels' summations cast a shadow upon the integrity of the prosecutorial team. Though not directly accusing the Government of suborning perjury, counsels' arguments lead to but one inference, that the victims were pawns in the hands of the Government testifying in the manner in which the Government saw fit. Mr. Cole's remarks were

in direct response to defense counsels' comments in closing that the Government intimidated its witnesses, cajoled them into testifying favorably for the Government, and, in fact, "purchased" their testimony.... Defense counsel, not the Government, first put the integrity of the United States attorney's Office in issue. The Government's response was invited and within the bounds of proper argument.

*United States v. West,* 670 F.2d 675, 689 (7th Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982). Accordingly, defendants' post trial motions on this ground must be refused.[29]

---

**29.** Defendants represented by counsel other than Messrs. Scandone and McAteer complain that Mr. Cole's summation prejudiced them, and that it was improper as to them because their counsel in closing did not impugn the integrity of the prosecutorial team. Although I agree that counsel for these defendants did not provoke Mr. Cole's response, because the remarks were directed solely at Messrs. Scandone and McAteer, I disagree that said remarks prejudiced them. *United States v. Somers, supra,* 496 F.2d at 739–40 n. 32. See also *United States v. West, supra,* 670 F.2d at 688–89 (only speaking in terms of harm to defendants in multi-defendant case whose counsels' remarks invited the response of the Government).

Finally, defendants contend they were prejudiced because a metal detector specially placed outside the courtroom was in view of the jury when they arrived and departed. I disagree. Here, I first informed counsel that the metal detector would be screened from the jury's view. Upon inquiring of the General Services Administration (GSA) for the necessary materials to do so, I was informed the materials were not available. I decided then to allow the jury to see the metal detector rather than partially shield it because the attempts at preventing disclosure might draw the jury's attention to the device. There was no error in the course I took. As I stated pretrial, metal detectors are part of everyday life. We encounter them at numerous places including airports, courthouses, and department stores to name but a

*Conclusion*

For the foregoing reasons, defendants' post trial motions are refused.

few. Second, in view of the fact that Neil Ferber was acquitted on all counts and Nicholas Fidelibus on one, it is clear that the jury reached its findings in this matter unaffected by the presence of the metal detector.